/S/
III

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### *Newark Division*

Ronald H. Posyton, III
113 Sussex Street
Westfield, NJ 07090

Vs.

Township of Westfield

    Serve:  Michelle W. Brindle
           520 Fairmount Avenue,
           Westfield, NJ 07090

DiFrancesco Bateman Coley Yospin Kunzman
Davis Lehrer & Flaum, P.C.

    Serve:  Stephen O. Davis
           15 Mountain Boulevard,
           Warren, NJ 07059

Case No.: _____

Gov. Donald T. DiFrancesco, Esq.
6 Forest Drive,
Warren, NJ 07059

Richard J. Guss, Esq.
1735 Merriam Drive,
Martinsville, NJ 08836

                *Defendants*

## COMPLAINT

1      Ronald H. Armstrong may have struggled in life, but it was his struggle. The State sum-

2  marily took it from him, on a rubber-stamping. *See Estate of Armstrong v. Village of Pinehurst*,

3  810 F.3d 892 (4th Cir. 2016). A State deputized future-danger-teller (psychiatrist) accused Mr.

4  Armstrong of being "a danger to himself" – "not" "a danger to others" – but nevertheless in

5   need of camping.[1] *Id.*, at 896. Three (3) police agents located Mr. Armstrong shortly after the

6   State's accusations and subsequently stood around him as a 'judge' was preparing to press its

7   camp-stamp. During this time, the parties were "calm" and engaged in "conversation," and one

8   (1) agent even persuaded and "convinced" Mr. Armstrong to do as police wished. *Id*. Once the

9   State had pressed its stamp,[2] however, the three (3) agents immediately "surrounded and ad-

10  vanced toward [Mr.] Armstrong – who reacted by sitting down and wrapping himself around a

11  four-by-four post that was supporting a nearby stop sign." *Id*. These agents "tried to pry [Mr.]

12  Armstrong's arms and legs off of the post, but he was wrapped too tightly and would not

13  budge." *Id*. These police agents then attempted to talk Mr. Armstrong off of the post – for about

14  a whole "thirty seconds or so." *Id.*, at 897. After those seconds past, the police chose to start

15  electrically shocking Mr. Armstrong's body with a taser. These agents tased Mr. Armstrong

16  "five separate times over a period of approximately two minutes" notwithstanding that the

17  State's electricity did nothing but cause Mr. Armstrong "'excruciating pain'" and just "in-

18  creased" his physical "resistance" around the post during every prolonged Government shock-

19  ing. *Id.*, at 897 & 902 (citation omitted). After the police scraped the idea of electrifying Mr.

20  Armstrong's body, these agents (including a "lieutenant") dismissed in conclusion that there

21  was no time to rush a skilled negotiator to the post or decreed that any type of doctor or profes-

22  sional trickster would be of no use in any event (notwithstanding that the agents had just "con-

23  vinced" Mr. Armstrong to "cooperat[e]" a few moments prior). More State agents were sum-

24  moned to assist with prying Mr. Armstrong's body from the post. *Id.*, at 897. This "group of

25  five successfully removed [Mr.] Armstrong and laid him facedown on the ground" while

---

[1] Camping laws essentially provide that a psychiatrist can accuse You of being dangerous to-morrow to confine You today. *O'Connor v. Donaldson*, 422 U.S. 563, 576 (1975).

[2] Issued a warrant for Mr. Armstrong's arrest/confinement.

26    "'choking him'" and "placing a knee on his back and standing on his back, respectively." *Id*.

27    (citation omitted). The State thereafter "cuffed" Mr. Armstrong's hands and "shackled his legs

28    too" as he kicked for his life. *Id*. These agents "then stood up to collect themselves" for about

29    "'15 to 20 seconds'" as Mr. Armstrong laid "facedown in the grass with his hands cuffed behind

30    his back and his legs shackled." *Id*., at 898 & n.5 (citation omitted). Some police then glanced

31    down at Mr. Armstrong, who was "blu[e]" and "dead." *Id*., at 898.[3]

## Power

32    1.    Jurisdiction exists and venue is proper pursuant to 28 U.S.C. §§ 1331, 1343, 1361, 1391,

33    2101, 2201, and 2202 via 42 U.S.C. §§ 1983, 12101 *et seq*.

---

[3] The Village of Pinehurst, the National Fraternal Order of Police, and the Southern States Police Benevolent Association were not only of the firm conviction that Mr. Armstrong's estate was entitled to absolutely nothing for the Village's police killing of Mr. Armstrong with electricity and bare hands (a position freely embraced by the Fourth Circuit), but the State also declared that Mr. Armstrong actually deserved to die, and that electricity and lots of bare hands were an appropriate way to kill him. *Cf. Village of Pinehurst v. Estate of Armstrong*, 137 S.Ct. 61 (2016); *see also* Village of Pinehurst Pet. for Cert. at 2016 WL 2766156; National Fraternal Order of Police Support for Cert. at 2016 WL 3356822; Police Benevolent Association Support for Cert. at 2016 WL 3254186; *accord* Reply to Opp. for Pet. for Cert. at 2016 WL 4659794, 2016 U.S. S.Ct. Briefs LEXIS 3213, at *2-13 (Relying on *Camreta* for standing to piss on Mr. Armstrong's grave). The Village of Pinehurst, however, must have simply petitioned the U.S. Supreme Court for review on moral supportive grounds for the legality of State killings. *See* Opp. to Pet. for Cert. 2016 WL 4410242, 2016 U.S. S.Ct. Briefs LEXIS 3032, at 10, n.1 (The "district court dismissed the municipality liability claim against" the Village of which "did not appeal that dismissal[.] … It is unclear why the Village of Pinehurst deems itself a petitioner.") And, if of any relevance, the 'opinion' of which the National Fraternal Order of Police is possessed by explains that You are "much safer when police" agents "are subject to less restrictive" use of force restraints when engaging You. *See* 2016 U.S. S.Ct. Briefs LEXIS 2397, at *7-8.

TASER International, Inc. argued that the electricity used against Mr. Armstrong for two (2) strait minutes was completely justified despite it having no effect other than having caused Mr. Armstrong "'excruciating pain.'" *See*, *Armstrong*, *supra*. TASER also accused Mr. Armstrong of dying from complications having no linkage to its or that of the State's electricity/killing. *See generally* TASER Support for Cert. at 2016 WL 3345339, 2016 U.S. S.Ct. Briefs LEXIS 2379 *and e.g.* at *10 (emphasis in original) (The 'Conducted Electrical Weapon' did not have "*any* … contribution" to the killing of Mr. Armstrong).

## Parties

34      2..  *Plaintiff*, Ronald H. Posyton, III ("Auditor"), is a 27-year-old, 5 foot, 3.5-inch-tall white

35    American male citizen. Auditor is a qualified individual with a disability: Auditor has/had

36    Schizoaffective Bipolar Type. Auditor was baptized and confirmed at the Catholic Church of

37    Holy-Trinity (the "Church") in Westfield. Auditor resided at 868 Carleton Road, Westfield, NJ

38    07090 (Auditor's "Home") from about September of 2009 till about October of 2018. Auditor

39    has lived in Westfield for about 26 years.

40      3.  *Defendant*, Township of Westfield (the "Town of Westfield"), always relevant herein,

41    was a political subdivision of the State of New Jersey, operated a quasi-military domestic polic-

42    ing force and/or the Westfield Police Force ("WPF"), and was comprised of about 39 police pa-

43    trol agents, eight (8) sergeants, five (5) lieutenants, two (2) captains, and a policing director.

44      4.  *Defendant*, DiFrancesco Bateman Coley Yospin Kunzman Davis Lehrer & Flaum, P.C.

45    (The "*Firm*"), always relevant herein, was counsel retained and employed by the Town of West-

46    field to represent and serve it and WPF agents unconditionally in matters of law.

47      5.  *Defendant*, Richard J. Guss, always relevant herein, was an attorney of *The Firm* who

48    represented *The Firm* as lead *Firmsman* in servicing the Town and its police in matters of law.

49      6.  *Defendant*, former New Jersey Governor Donald T. DiFrancesco, always relevant herein

50    was a member of *The Firm* representing the Town and its agents in matters of law.

51      7.  Besides for defending the Town of Westfield and policing agents in Auditor's prosecu-

52    tions, *The Firm*, Mr. Guss and Gov. DiFrancesco have represented and served the Town and its

53    agents with *Firm* activities through *Sorrentino v. Town of Westfield*, No.: 2:11-cv-7412-MCA

54    (D.N.J. Dec. 21, 2011) (consolidating *Rolnick v. Town of Westfield*, No.: 2:11-cv-7414-SRC

55   (D.N.J. Dec. 21, 2011)), *Shale v. Township of Westfield*, No.: 2:15-cv-8461-CCC (D.N.J. Dec.

56   12, 2015), and *Green v. Town of Westfield*, No.: 2:17-cv-289-JMV (D.N.J. Jan. 13, 2017).

**Guide**

57   9.   Jason Carter, always relevant herein, was a police agent for WPF and employed by the

58   Town; Carter was a WPF lieutenant (or superior raking officer, such as police Captain). Carter

59   was the Overseer of WPF's internal affairs complaint unit.

60   10.   Christopher E. Battiloro, always relevant herein, was a policing agent for WPF and em-

61   ployed by the Town. On and after August 1, 2018, Battiloro was Policing Director for WPF al-

62   ways relevant herein; prior to said date, Battiloro was a WPF Captain and tasked with investi-

63   gating administrative complaints within the Town's internal affairs policing unit.

64   11.   Frank J. Padovano, always relevant herein, was a policing agent and lieutenant for WPF

65   and was employed by the Town.

66   12.   Kevin J. O'Keefe, always relevant herein, was a policing agent and sergeant for WPF

67   and was employed by the Town. O'Keefe's education is comprised of completing Perth Amboy

68   Vocational-Technical and Police School.

69   13.   Marcin Kapka, always relevant herein, was a policing agent and sergeant for WPF and

70   was employed by the Town.

71   14.   Steven Martinez, Preston Freeman, Christopher Forcenito, Robert J. Riley, Richard Gill,

72   Joseph Natale, always relevantly herein, were policing patrol agents for WPF and were em-

73   ployed by the Town.

74   15.   David C. Wayman, always relevant herein, was Policing Director for WPF and was em-

75   ployed by the Town. As Director, Wayman enjoyed a salary of about $157,000.00 per year.

76   16.   The Town and Firm, John/Jane Doe, Battiloro, Padovano, Riley, O'Keefe, Kapka,

77  Freeman, Martinez, Forcenito, Gill, Wayman, Natale, Mr. Guss, and Gov. DiFrancesco (some-

78  times individually and/or collectively referred to herein as "State" or "Police," and/or other), al-

79  ways relevant herein, preformed all actions and engaged in all omissions and/or decision-mak-

80  ing un- der color of law.

81      17.  The Town and the Firm are "persons" within the meaning of § 1983 (*see*, *infra*).

82      18.  The Town and the Firm, Mr. Guss and Gov. DeFrancisco are being prosecuted in every

83  capacity (e.g., personal, official, insurance capacity).

84      19.  All WPF agents, always relevant herein, were fully dressed in police uniforms, armed

85  with handguns, and linked to marked Ford Interceptor Utility type policing vehicles.

86          Ambiguous language or grammar used herein should be interpreted as averse and preju-

87  dicial against the State and implicating it in wrong when applicable. This Power should accept

88  all labeling and averments as accurate and true under a 12(b)(6) review. All ambiguities are re-

89  solved in Auditor's favor; this Power should liberally construe it all.

### Facts

90      20.  Auditor's childhood Home was not large but, it might have resembled what 'is' the

91  America dream. As of around 2018: There were about 50 houses located on Carleton; the Home

92  was located near the middle area into the 800 block of Carleton. There were houses located on

93  the left, right, and back sides of the Home's property. The Home's lot was about 0.3616 acres or

94  105 by 150 feet in dimension; the front lawn running parallel to the street was roughly 105 feet

95  long. There was a front pathway made of some solid extending approximately 45 feet from Car-

96  leton's public sidewalk to the Home's front door; this pathway encompassed and/or led to two

97  concrete steps which ascended about three feet high from ground-level to the Home's front

98  door; these steps transformed into a roughly four-square foot platform extending/attaching



99    directly to the Home. A garden comprised of many plants and flowers and some large bushes or

100    small bushy trees existed near the far edging of the Home's yard attached to then 902 Carleton;

101    this garden extended from near the beginning of the street to the Home's back yard. A fence

102    stood near the end of this garden and stretched to the farthest edge of the back yard (and/or

103    nearby then bordering 865 Boulevard). On the Home's yard edging close by then 862 Carleton

104    stood bushes and plants scattered from around the beginning of the street to approximately 50 to

105    60 feet deep into the yard. Past this yardage sat condensed bushes, large & tall trees, and an ex-

106    tremely large (but not tall) green leafy plant spreading and extending about, across, and towards

107    the farthest part of the Home's back yard. Also deeper near this side-edging existed a 15-foot-

108    long, decaying fence extending to the dimensional edge of the back yard. And, lastly, in general,

109    a fence ran along the edge of the Home's back yard. So, in sum, there was fencing on all sides

110    of the Home's yard (besides for the edging of the front lawn); there was a front walkway lead-

111    ing to the front door; the yard was comprised of dirt, grass, and earth; and there existed a drive-

112    way of which led deep into the back yard. Exhibit A.

113        21.   Besides for essentially nothing other than what could be described as brief trips else-

114    where, Auditor lived at the Home every day from about 2009 to 2018. During this time, Auditor

115    slept in the Home, and performed a multitude of other activities within the Home; he retained a

116    key which unlocked the Home's exterior doors; he could come and go from the Home at will;

117    his mail was delivered to the Home; and all of Auditor's possessions (e.g., clothes, desk, bed,

118    etc.) were stored in the Home. Auditor steadily utilized the Home's yard and front lawn for

119    many activities (e.g., playing catch & building snowmen). And landscapers would visit the

120    Home on a regular basis and groom the entire property.

121        22.   The Home was owned by Vincent Bontempo. Bontempo owned many other rental

122    properties during this time.

123        23.   Auditors Mother usually gave Bontempo monetary compensation in an timely fashion to

124    rent the Home on a monthly basis.

125        24.   Since 2009 till always relevant herein, Auditor performed various tasks prescribed by

126    his Mother in exchange for enjoyment of housing or that of the Home and its property.

127        26. Throughout said period, Auditor's Mom gifted Auditor enjoyment in the Home and its

128    property, and supplied him with authority to exclude, ban, and/or forbid strangers from entering

129    upon the Home or its property during the dead of night/morning; Auditor's Mom welcomed Au-

130    ditor to exercise this authority, or significantly encouraged him to protect the Home and their

131    family from strange intruders.

132        27.   In the early hours of December 23, 2009, Westfield homeowner, Kimberly Sorrentino,

133    Esq., and her son, Austin Rolnick, are standing within their fenced-in gated front yard surround-

134    ing their house. (See Sorrentino at D.E. 1, ¶¶ 16 & 20). At the same time, Kapka, Freeman, and

135    Martinez stand nearby on the corresponding sidewalk. (Id., at ¶ 20). Ms. Sorrentino advises

136    these agents that they cannot enter the property. (Id., at ¶ 25). Martinez, Freeman, and Kapka

137    nevertheless enter onto the property anyway as Mr. Rolnick and Sorrentino return to their house

138    and enter thereafter. (Id., at ¶ 26). The agents steadily approach the home and then shove and

139    trample over Ms. Sorrentino and tare her 'anterior cruciate ligament' as they invade the house in

140    pursuit of capturing and arresting Mr. Rolnick for supposedly having defied them. (Id., at ¶¶ 28-

141    31). A judge found that these Police violated natural law and trashed the evidence gathered be-

142    cause of the invasion. Exhibit B. The Town and its agents gave Sorrentino about $1,000,000.00

143    and gave Mr. Rolnick about $100,000.00 in response to their ensuing civil actions. The Town

144    and its agents also gave Ramon Martinez (another civilian subjected to this policing

145   engagement) about $55,000.00 in response to his ensuing civil action for being "forcibly

146   throw[n]" and "spray[ed] with mace" by WPF agent Martinez. (See Rolnick at D.E. 1, ¶ 41). It

147   is likely that no Town policing agent was disciplined for involvement in this matter; Kapka,

148   however, was promoted to the rank of police sergeant soon thereafter.

149   28.  Around December 6, 2013, a law office in Westfield belonging to Courtney Schael,

150   Esq., catches fire and starts to burn. (See Schael at D.E. 1, ¶¶ 20 & 24-25). The Westfield Fire

151   Department responds to suppress the fire and ultimately concludes that it has been extinguished.

152   (Id.). Subsequently, Ms. Schael moves away from WPF and observed flames coming from her

153   law office. (Id., at ¶ 27). Ms. Schael attempts to approach Westfield fire personnel to alert them

154   of the fire but WPF police sergeant Lauren Maloney, however, prevents Ms. Schael from doing

155   so, and instead starts "pushing and striking [Ms. Schael] in the face" and arrests her as her law

156   office is going about the process of burning to the grown before her very eyes. (Id., at ¶¶ 28-33).

157   According to Ms. Schael via phone-call with Auditor in 2017, the Town and its agents agreed to

158   comfort her with a settlement in response to her ensuing civil-action. And it is likely that no

159   Town police agent was disciplined for involvement with these events.

160   29.  From 2012 till the 2nd quarter of 2018, besides for a few "rule violation[s]" and appar-

161   ent times of poor police "demeanor," no assertion of WPF misconduct has been "sustained" by

162   the Town during these six (6) and some half years, including those circumstances concerning

163   Schael's likely filed complaint against Maloney and other WPF agents. Exhibit C.

164   30.  Around June 27, 2017, 9:45 p.m., Auditor enters the lobby of WPF headquarters and,

165   like Auditor's future meetings with all the other State.agents, Auditor meets O'Keefe for the

166   first time and begins this First/Ninth Amendment government audit. Exhibit D. Auditor and

167   O'Keefe sit down on a bench located inside WPF's lobby for a short time and Auditor, in a

168    friendly manner, casually askes O'Keefe questions about searches and seizures, constitutional

169    questions of which O'Keefe is unable to answer. Auditor and O'Keefe, however, then shake

170    hands and Auditor leaves WPF headquarters.

171       31.   Later-on that evening, around 10:10 p.m. or so, Auditor enters 16 Prospect Street Wine

172    Bar & Bistro (the "Bistro") in downtown Westfield and sits down at its bar. A drunken stranger

173    and life-long police agent, Kenneth Hogan, reaches over some chair(s) and unjustifiably and of-

174    fensively grabs Auditor's shoulders. The Bistro's co-owner, Timothy Boyle, illegally touches

175    Auditor as he is leaving the Bistro. After exiting the Bistro, Auditor calls WPF and reports an

176    assault and battery against Hogan and Boyle. O'Keefe, Martinez, Forcenito, Freeman, and WPF

177    agent Ricardo Johnson respond, and O'Keefe speaks with Boyle. After speaking with Boyle, but

178    without interviewing the complainant (or Auditor), O'Keefe says no assault or battery has oc-

179    curred, within approximately 60 seconds of arriving on the scene of the Bistro. Successively,

180    O'Keefe accuses Auditor of smelling like alcohol and of having been drinking alcohol, of hav-

181    ing previously been "arguing with patrons" and of having "unlawful[ly]" entered the Bistro with

182    alcohol. Although O'Keefe recognizes and says that Auditor "obviously looks like he's not in-

183    toxicated and can care for himself," and also observes and says that Auditor is "obviously not

184    intoxicated," O'Keefe nevertheless tells Auditor that he needs to "take the [victim] high road"

185    or, be transported to a police detention center located in Elizabeth, NJ; Auditor submits to this

186    "high road." A few minutes later, and while standing away from Auditor, O'Keefe tells Mar-

187    tinez to turn off his voice recording mic, saying, "You're on here, right? Is it on or not on?"

188    Martinez then deactivates his device for about 10 seconds and reactivates it as O'Keefe tells

189    Martinez to, report and "say [Hogan] ... observed [Auditor] being aggressive," irrespective of

190    the fact that no agent had yet interviewed or spoken to Hogan. Next, Forcenito pats Auditor

191 down for weapons, supposedly pursuant to WPF's "standard operating procedure" of searching

192 every America notwithstanding whatever. Around the same time and as Auditor begins the pro-

193 cess of entering a WPF squad car, O'Keefe orders the running of an extensive 19-minute-long

194 nation-wide warrant check on Auditor; nobody else like Hogan, for example, is reviewed for

195 outstanding warrants. During this national search for information on whether Auditor is a fugi-

196 tive of justice, O'Keefe tells Auditor that WPF has discovered the existence of a facially valid

197 warrant issued for his arrest in South Carolina; these agents begin discussing possible options

198 for extraditing Auditor as he sits locked inside a human cage. The warrant, however, was issued

199 for somebody else; Auditor has never entered a Carolina. After Police learn that the "W9 check"

200 on Auditor was always clear, Martinez and Johnson involuntarily transport Auditor Home upon

201 O'Keefe's instructions and over Auditor's objections. Once Auditor, Martinez, and Johnson ar-

202 rive at Auditor's Home, Auditor advises Martinez and Johnson that they may not go onto his

203 property. Despite Auditor's passionate objections to arbitrary governmental entry and intrusion

204 to the sanctity of Auditor's Home around 11:00 p.m. or so, the domestic Military nevertheless

205 storms, invades, and occupies the Home's front lawn and engages Auditor's Mother.

206     32.   From around June 29, to about July 6, 2017, Auditor sends a few e-mails to then Town

207 Mayor, Andy Skibitsk, and to some Town councilmembers, opining that the Town's Policing

208 agents acted unlawfully on June 27, 2017.

209     33.   On July 14, 2017, Auditor files suit against the Town and said WPF agents. See *Posyton*

210 *v. Township of Westfield*, et al., No.: 17-cv-5139-JMV (D.N.J. July 14, 2017) (occasionally

211 hereafter "D.E. (#)" or "ID (#)"). The Town primarily sent its Firm and Mr. Guss into this Court

212 to defend the Town itself and to repel or suppress claims against its Policing agents.

213     34.   On July 20, 2017, Auditor submits an Open Public Records Act (OPRA) demand to the

214    Town pursuant to N.J.S.A. § 47:1A-1 et seq. (allegedly requesting records implicating "all

215    events regarding [Posyton] occurring on June 26, 2017.")

216    35.   On July 21, 2017, the then Town Clerk, Claire Gary, supplies Auditor with a true and

217    accurate copy of the WPF investigative police report concerning the June 27, 2017. <u>Exhibit E</u>.

218    36.   On September 18, 2017, the Mr. Guss moved for Summary Judgment. D.E. 12. In sup-

219    port of said Motion, the State filed D.E. 12-2 pp. ID 103-107.

220    37.   On September 20, 2017, Auditor sent Mr. Guss an e-mail and advised to

221    "correct any error" concerning page ID 103 in relation to Auditor's "social security number,"

222    provided the filing violated "Local Rule 17" and "Fed.R.Civ.P. 5(2)(a)" (which it does (e.g.,

223    *Engeseth v. County of Isanti, Minn.*, 665 F. Supp. 2d 1047 (D. Minn. 2009)). Mr. Guss never

224    remedied his violations removing Auditor's social security number from public view.

225    37.   On December 12, 2018, Auditor e-mailed Mr. Guss and conveyed to him again to re-

226    move the Auditor's social security from the docket.

227    38.   Mr. Guss has done nothing in relation to Page ID 103; rather, about 12 hours after the

228    December 12th email. Mr. Guss contacted this Court regarding the Town of Westfield via filing

229    waivers of service for WPF police defendant agents in Green. *See Green* at D.E. 44.

230    39.   Mr. Guss may have declined to contact the Court about Auditor's posted social security

231    number in effort to advert some detrimental consequence prior to obtaining favorable judgement

232    on his Motion to Dismiss (a Motion of which had already been pending for about seven (7)

233    months as of December of 2018). See D.E. 55.

234    40.   Auditor moreover forwarded the relevant abovementioned previously authored Decem-

235    ber 12, 2018, e-mail to Mr. Guss on May 13, 2019, and then sent one (1) blank or "(no subject)"

236    collective e-mail to Gov. DiFrancesco, Mr. Guss, and WPF on May 17, 2019.



237    41.  Gov. Difransesco responded to Auditor's said email via email sent from his iPhone.

**Summaries – Claims – Conclusions**

238    42.  The Firm, Mr. Guss, and Gov. DiFrancesco are shining examples of *de facto* State

239    agents – they represent the Town and its policing agents in judicial proceedings daily; the Firm,

240    Mr. Guss, and Gov. DiFrancesco are the Town itself. The Town also gave The Firm and said

241    actors a governmental 'record' divulging Auditor's social security number. OPRA categorically

242    forbids State disclosure social security numbers less one (1) limited exception: disclosure is

243    made to a public agency.

244    43.  Obtaining social security numbers from the Sate and filing those numbers on behalf of

245    the State in open Court, and refusal to thereafter remove the State's filing of such private infor-

246    mation upon advisement to do so – is action responsible by the State itself.

247    44.  The Firm and Mr. Guss are also shining examples of governmental policy-makers – they

248    are the highest level of authority in relation to the Town's litigation decisions and strategies;

249    and/or at least in relation to legal courses of action involving Auditor's cases. And, all Auditor

250    policies have been principally sculpted and enacted by Mr. Guss, who operated throughout Au-

251    ditor's case with unfettered discretion and full Firm authority.

252    45.  Mr. Guss violated Auditor's legitimate subjective expectation of privacy that society

253    recognizes as objectively reasonable by revealing Auditor's social security number to the public

254    for years (and refused to remove the display of said information), in direct response to Auditor's

255    access of Court, all in violation of Auditor's rights secured by the First and Fourteenth Amend-

256    ments to the U.S. Constitution, respectively, and, therefore, Mr. Guss is responsible via § 1983.

257    46.  Gov. DiFrancesco knew or should have known (via Auditor's advisement email), his

258    Firm displayed Auditor's social security numbers to the public for years, and Gov. DiFrancesco



259   failed to intervene in this privacy infringement by refusing to do anything about it, all in viola-

260   tion of Auditor's rights secured by the Fourteenth Amendment to the U.S. Constitution, and,

261   therefore, Gov. DiFrancesco is responsible via § 1983.

262     47.  It is Firm Town policy to display Auditor's sensitive private information in direct re-

263   sponse to Auditor's access of Court, all in violation of Auditor's rights secured by the First and

264   Fourteenth Amendments to the U.S. Constitution, respectively, and, therefore, The Firm and

265   Town are responsible via § 1983.

**Facts**

266     48.  On September 29, 2017, Auditor files an administrative complaint against O'Keefe,

267   Freeman, Martinez, and Forcenito with Battiloro and WPF's internal affairs unit. An investiga-

268   tion ensues. Battiloro advises Auditor that he will be informed of the outcome of the investiga-

269   tion after its completion, which investigation was to take approximately 30 days. The

270   Town/Battiloro send Auditor a letter informing him that WPF found no police wrongdoing in-

271   volving the June 27th matter around July 5, 2018, after Auditor avers that WPF has "refused to

272   inform Auditor of the investigation's outcome" at D.E. 1 at ¶ 46 technically in *Posyton* III.

273     49.  From about November of 2017 till October of 2018, Auditor works as a cashier at a 7-

274   Eleven convenience store located at 800 Central Avenue and around the block from his Home.

275   Throughout this period, many WPF agents (including, but not limited to, Battiloro, O'Keefe,

276   Martinez, Freeman, Forcenito, Gill, Shaughnessy, Desiato, Santangelo, and Wayman) enter 7-

277   Eleven, and are generally rung-up by Auditor; this occurs about four (4) times with Forcenito

278   and Shaughnessy; twice with Gill with Battiloro; and once or twice with many other WPF

279   agents. Additionally, while Auditor works at 7-Eleven, countless WPF agents (and likely most

280   WPF agents) repeatedly drive into a Valley National Bank parking lot located across the street



281    from 7-Eleven on a daily basis, sometimes in multiple shifts, and park their squad cars facing

282    directly at 7-Eleven's cash register window area; this positioning offers a direct line of sight for

283    all WPF agents who so desired to stare at Auditor as he operates a cash register throughout the

284    day or night, depending on the changing shift schedule (i.e., 1st, 2nd, or that sketchy 3rd shift).

285        50.  On or around January 12, 2018, at 1:30 a.m., Auditor is visiting a friend (C) at his house

286    in Westfield. Auditor's friends (M & J) are also visiting at C's house. Auditor is intoxicated

287    around this time due to his consumption of many alcoholic beverages. Auditor leaves C's house

288    and begins walking towards his Home located about 1.9 miles away. It is approximately 45 de-

289    grees Fahrenheit outside and Auditor is wearing jeans, a T-shirt, and a light Ralph Lauren

290    sweater modeling its insignia – polo. Auditor soon begins to become cold and feels uncomforta-

291    ble. Auditor calls WPF for assistance. Auditor divulges his name and asks for a WPF agent to

292    transport him Home because he is intoxicated. O'Keefe, Martinez, Johnson, and at least two (2)

293    other WPF agents are dispatched and arrive soon thereafter in about four (4) squad cars. The

294    agents gather around Auditor. In turn, Auditor informs these agents that he is intoxicated and

295    then requests for them to assist him to his Home. O'Keefe declares that Auditor is not intoxi-

296    cated and tells Auditor that the State will not assist him. Auditor says that these agents' refusal

297    to help him "violates the Equal Protection Clause;" some agent briefly laughed in response. Af-

298    terwards, these agents return to their vehicles and drive away. At least one (1), if not every sin-

299    gle agent, however, likely then generally do absolutely nothing besides drive around Westfield

300    for about the next 50 minutes as Auditor walks Home in the cold. The Police report indicates

301    and categorizes Auditor as an "intoxicated male." <u>Exhibit L</u>. The Police report also provides in

302    part that Auditor was "of sound body;" this is a lie.

303        50.  On or around May 4, 2018, at 2:00 a.m., Auditor is visiting M's house located in

304    Westfield and about one (1) block from St. Marks Avenue. C and J are also visiting. Auditor is

305    intoxicated due to his consumption of many alcoholic beverages. Auditor leaves M's house and

306    begins to walk towards his Home located about 1.4 miles away. Once Auditor reaches St.

307    Marks, he calls WPF for assistance. Auditor's identity becomes known; the operator connects

308    Auditor with O'Keefe. Auditor asks for a WPF agent to assist him Home because he is intoxi-

309    cated. O'Keefe, Freeman, and one (1) other WPF agent begin traveling to St. Marks and arrive

310    soon thereafter. In turn, Auditor informs these agents that he is intoxicated and asks them to as-

311    sist him Home. O'Keefe declares that Auditor is not intoxicated and that WPF will not assist

312    him Home. In response, Auditor performs a few spectacular jumping-jacks as he asks these

313    agents, "Am I intoxicated now?" Successively, the agents return to their vehicles and drive

314    away. At least one (1), if not every single agent, however, likely then generally do absolutely

315    nothing besides drive around Westfield for about the next 40 minutes as Auditor walks Home.

316    The Police report indicates that "[Auditor wa]s intoxicated." Exhibit M. The report also pro-

317    vides in part that Auditor was "not intoxicated;" this is a lie.

318        51.  On or around May 25, 2018, at 2:00 a.m., Auditor is visiting M's house; J is also visit-

319    ing. Auditor is intoxicated due to his consumption of alcoholic beverages. Auditor is wearing

320    jeans and a polo shirt. Auditor leaves M's house and begins walking Home. Once Auditor

321    reaches St. Marks, he calls WPF for assistance. Auditor neither divulges his name nor is his

322    identity recognized. Auditor asks for a WPF agent to assist him Home because he is intoxicated.

323    Riley is dispatched to St. Marks and arrives soon thereafter; Johnson is also dispatched but does

324    not arrive until sometime later. In turn, Auditor informs Riley that he is intoxicated and asks Ri-

325    ley to assist him Home. Riley opens his squad car's back door, Auditor enters, and Riley closes

326    the door. Riley enters the driver's seat and radios that Auditor "just needs a ride Home" and that



327   Auditor is going to be assisted Home by Riley. Exhibit N. Riley then begins driving towards

328   Carleton and Johnson intercepts and begins following behind around here. As Auditor and Riley

329   close upon Carleton (near Grove Street), Auditor advises Riley, "You don't need to ... go up to

330   my uh – my house, my curtilage. ... I don't really want ya to go onto my curtilage. I forbid you

331   to do it." Exhibit O. After Auditor and Riley turn onto Carleton from Grove, Auditor asks Riley

332   to pull the squad car to the side of the road so Auditor can exit, and Riley does just that; John-

333   son, who is still following Riley and Auditor, also does the same. Riley parks his squad car near

334   820 or 826 Carleton Road and/or about seven (7) houses away from Auditor's Home. This oc-

335   curs around 2:12 a.m. or so. Riley exits the driver's seat and opens the squad car's back door

336   and Auditor exits. Auditor sincerely thanks Riley for the assistance and shakes Riley's hand.

337   Auditor waives to Johnson and begins walking in the direction towards his Home. After Auditor

338   has walked past about five (5) houses, Riley drives past Auditor and then his Home. There are

339   no lights activated in Auditor's Home that could be seen from outside. Riley continues driving

340   towards the end of Carleton and then turns onto Sycamore Street en route to Central. Johnson

341   also vacates Carleton. Cf. Exhibit P. No police are on Carleton as of this point. Prior to Riley's

342   encounter with Auditor, Riley was likely unaware or indifferent to Auditor's identity.

343      52. Auditor reaches his lawn but does not enter his Home; Auditor instead remains outside

344   and calls WPF. This call occurs around 2:19 a.m.

345      53.  During this call, Auditor speaks in a slow, soft, and gentle tone of voice. The following

346   denotes the roughly 44-second call between a WPF operator and Auditor.

347        Operator: 911 where is your emergency?
348        Auditor: Yes, I am um – I'm – your, your officers just escorted me Home. And I am safe
349                at Home – I'm on curtilage. And I just would like to say that I am uh – if um
350                Mr.  Guss has anything to say then I am uh, did not – did not do anything. Al-
351                right, thank you very much.
352        Operator: Hey, hang on a minute – what's the – what's the issue?

353    Auditor: There is no emergency. There is no issue. I have been transported Home by your
354    officers.
355    Operator: Alright, is there anything else? Are you just saying thank-you?
356    Auditor: I'm just saying thank-you.
357    Operator: Alright, thank you very much.
358    Background/Unknown: He wants to make it a habit of (unintelligible).
359    Operator: Alright, buh-bye.
360    Auditor: Alright, b- (Operator disconnects Auditor).

361    <u>Exhibit N</u>.

362    54.  After the WPF operator hangs-up on Auditor, Auditor continues to remain outside

363    around his Home and, at some point, Auditor walks onto his neighbor's lawn. Auditor remains

364    in this general vicinity for some time hereafter and does not venture far; rather, Auditor stands

365    close to the garden bordering his and his neighbor's yards.

366    55.  Meanwhile, approximately 12 seconds after WPF terminates said call, the operator ra-

367    dios Riley that Auditor "just called ... to thank [him (Riley) and Johnson]." Id. WPF agent

368    and/or sergeant Kapka then radios Riley to go inform Auditor to refrain from using "the police

369    department as a taxi service" and says, "Apparently he's made a habit of this." Id. Riley subse-

370    quently begins driving towards Auditor's Home for the sole purpose of finding and contacting

371    Auditor so to inform Auditor to refrain from asking WPF "for rides home." <u>Exhibit Q</u>.

372    56.  While Auditor is standing on his neighbor's lawn at 902 Carleton, Riley turns onto Car-

373    leton from Grove and begins approaching Auditor's Home. As Riley nears Auditor's Home,

374    Auditor slowly repositions himself a few feet to the left across his neighbor's lawn and just cas-

375    ually stands upright alongside a large bush or small tree; this adjustment would likely somewhat

376    obstruct someone's ability to see Auditor when being located in front of the Home.

377    57.  Riley pulls up to and parks his squad car in front of Auditor's Home; this occurs around

378    2:25 a.m. or so. No person is located outside on or about Carleton besides for Auditor and Riley

379    around this time. Riley exits his vehicle and begins approaching the Home's front door. Riley

380    walks into and up the pathway leading to the Home's front door. Riley reaches the two (2) steps

381    ascending to the front door; climbs those steps, and ultimately plants both of his feet on the plat-

382    form attached to Auditor's Home that leads to the front door. Riley, however, never touches the

383    Home's front door or its doorbell, notwithstanding that he ultimately becomes situated about

384    one (1) second and/or a couple feet away from doing so; this is because as Riley is approaching

385    the Home, Auditor returns to his lawn by walking through the garden separating his and his

386    neighbor's yards and, after Auditor is fully located on his lawn and while Riley is climbing the

387    final step needed to reach the platform leading to the Home's front door, Auditor explicitly yells

388    at Riley, "Get off my property!" Riley hears every word of the same; nothing is producing any

389    noise or obstructing Riley's ability to hear Auditor around 2:26 a.m. on Carleton.

390        58.   Upon hearing Auditor's command to exit his property, Riley immediately turns away

391    from the Home and begins to exit the platform leading to the Home's front door. Riley walks

392    down the two (2) steps and returns to the front pathway leading to the street but, Riley then de-

393    viates from the Home's front pathway by executing a sharp turn onto the grassy area of the

394    Home's yard. Riley begins approaching Auditor. Around here, Auditor believes that he is not

395    free to do whatever or ignore Riley and go about his business. When Riley reaches Auditor, Ri-

396    ley is standing on the lawn's grassy area roughly 25 feet away from the front pathway and about

397    20 feet away from the Home. Riley seems or appears somewhat angry or annoyed upon reach-

398    ing Auditor. Riley then speaks to Auditor for about 10 seconds. Riley tells Auditor, "You know

399    I'm the officer you just thanked, right? Listen, stop calling us for rides home – we're not a taxi

400    service, ok?" Auditor remains silent during Riley's lecture. Following the conclusion of Riley's

401    lecture, Riley just stands silently looking at Auditor. Over the course of the subsequent few sec-

402    onds of silence surrounding Auditor and Riley, it becomes clear that Riley is never going to

Page **19**

403  leave Auditor or his lawn alone until Auditor produces some type of acknowledgment of the

404  State's lecture. As a result, Auditor says, "Ok," and then Riley leaves Auditor's Home soon

405  thereafter and eventually drives away. Exhibit Zd.

406  59.  At some point(s) within the next 30 days following May 25, 2018, Auditor becomes in-

407  toxicated due to his consumption of alcoholic beverages; he is located in Westfield some dis-

408  tance away from Home, and he is without another's means of assisting him Home. On or around

409  said point(s), Auditor does contact WPF on said date(s) and instead walks Home on foot. Audi-

410  tor understood that making such contact would result in some cognizable detriment.

### Summaries – Claims – Conclusions

411  60.  Auditor has always enjoyed a possessory interest and a legitimate subjective expectation

412  of privacy that society recognizes as objectively reasonable in relation to the Home and its im-

413  mediately surrounding land, especially during the dead of morning, and he possesses standing to

414  challenge any police presence upon either. Auditor had been living at the Home for about the

415  past 10 years and he could come and go at will, and all of his possessions were located inside

416  the Home during that period. The dimensions of Home's yard were defined by fences, gardens,

417  bushes, trees, adjacent neighboring homes, and a public roadway and sidewalk. The Home's en-

418  tire property was regularly groomed by a landscaping company; it was located amid an incredi-

419  bly safe semi-condensed residential neighborhood, and it was not only utilized daily for reach-

420  ing the Home, but it was also used for many other activities such as building snowmen and

421  playing catch. Auditor likewise employed considerable safeguards and took substantial steps to

422  keep his lawn private by excluding others; Auditor, for example, advised Riley that he was "for-

423  bid[den]" from entering upon the Home's lawn. Every square inch or part of the Home's lawn,

424  yard, and property (including its driveway, front pathway, steps, and platform) is 'land'



425   immediately surrounding Auditor's Home and/or is always curtilage (especially here and

426   around 2:30 a.m.) and is protected by the Amendments from arbitrary governmental intrusion.

427       61.   Auditor explicitly advised Riley that he was absolutely forbidden from entering Audi-

428   tor's property and, Riley initially complied with Auditor's proclamation by driving far away

429   from Auditor's Home. Auditor called WPF and clarified that he was "safe ... on curtilage" or,

430   otherwise again decreed that no police could intrude upon the privacies of Auditor's life unless

431   the intrusion was reasonable. Riley returned to Auditor's Home approximately five (5) minutes

432   later around 2:26 a.m. and began approaching the front door of the Home. Yet, after Riley

433   reached the Home's front door but just before he could perfect his plan, Auditor commanded

434   Riley to immediately exit his lawn by yelling, "Get off my property!" Riley refused and instead

435   chose to venture further and travel deeper into Auditor's curtilage. Riley then stood stationary

436   upon Auditor's lawn and did not leave until he finished lecturing Auditor and received satisfac-

437   tory acknowledgment of the same.

438       62.   Riley did not enter and occupy Auditor's curtilage to combat or prevent imminent haz-

439   ard or danger or to aid others in distress or injury; no information existed showing an exigent or

440   any other safety issue to be present on Auditor's curtilage or otherwise within his Home. Riley

441   moreover did not really even know whether anyone was inside of the Home or located on its

442   property. Riley was not bypassing through the Home's curtilage to go elsewhere. Riley also did

443   not approach Auditor's Home for any traditional or recognized investigatory purpose; there ex-

444   isted no information suggesting any indication of crime being associated with the Home or any-

445   one affiliated with it. Rather, Riley's sole and only purpose for approaching Auditor's Home

446   was to find nobody other than Auditor so to then briefly say some words to him.

447       63.   Riley's purpose for approaching the Home during the dead of morning and his actual



448    entry and occupation upon Auditor's curtilage, from his very first step till his very last, was con-

449    trary to widely shared social expectations and norms and the habits of the country. Riley's pre-

450    meditated plan to approach Auditor's Home and pound on its front door or ring its doorbell was

451    going to prompt lots of loud noise to echo throughout the Home. Riley's likely foreseeable act

452    or something surely to be interpreted as nearly identical to that of him banging on the Home's

453    front door around 2:30 a.m. while repeatedly announcing, 'POLICE – OPEN UP,' was either

454    going to disturb, awake, rattle, or perhaps traumatize others who might have been located in the

455    Home like, for example, a sleeping teenage girl; and, Riley's execution of his plan was most un-

456    doubtedly going to aggravate Auditor. Riley was and is a total **_stranger_** to everyone intimately

457    associated with the Home and its property but, despite this, Riley and Kapka, however, appar-

458    ently had no problem whatsoever and could care less about arousing anyone and everyone out

459    of bed to stand at attention because Police had a slight itch to briefly say a few words to the citi-

460    zenry. No reasonable respectful private American would have replicated Riley's actions via ap-

461    proaching a stranger's Home at approximately 2:30 a.m. in defiance of the fact that a full-grown

462    man and/or only resident physically present had just explicitly decreed that entry upon their

463    lawn was categorically "forbid[den];" nor would any competent American approach and subse-

464    quently venture deeper into such a stranger's property so to lecture that resident as they were

465    yelling, "Get off my property!" Riley did not enjoy a customary license and/or implicit consent

466    to either approach the Home's front door or to travel towards and thereafter occupy the part of

467    curtilage near where Auditor was standing. And, any such consent was certainly not unequivo-

468    cal or specific, or freely or voluntarily given, or otherwise abided by in scope.

469        64.  See Kentucky v. King, 563 U.S. 452, 469-470 (2011) (Alito, J.) ("When law enforce-

470    ment officers ... knock on a door, ... occupant[s] ha[ve] no obligation to open the door[,] ...

471    respond[,] or to speak[;] ... need not allow the officers to enter the premises[;] and may refuse to

472    answer" questions and "choose ... to stand on their constitutional rights" at any time), Collins v.

473    Virginia, 584, __ U.S. __, __, 138 S.Ct. 1663, 1681 (2018) (J. Alito, dissenting) (quoting Maj.

474    Opn., at 1678-1679) (Police need a warrant, exigency, or consent (implicit or explicit) to in-

475    fringe "home's 'curtilage'" enjoyed by occupant of house paid for by another), United States v.

476    Carloss, 818 F.3d 988, 1003 (10th Cir. 2016) (J. Gorsuch, dissenting) (Police "need a warrant,

477    exigent circumstances, or consent ... to reach the home's front door"), Florida v. Jardines, 569

478    U.S. 1, 7 (2013) (Scalia, J.) (Unprivileged "unlicensed" police existence on curtilage accom-

479    plished without express invitation violated Amendment), id., at 8 (Police entry/occupation in

480    curtilage is unlicensed/nonconsensual upon failure to comply with "traditional invitation" terms

481    observed by reasonable respectful strange and timid "Girl Scouts" or "trick-or-treaters"), Col-

482    lins, 138 S.Ct., at 1673, n.2 (Unlicensed upon venturing "beyond where a neighbor would" go),

483    Carloss, 818 F.3d at 999 (C.J. Tymkovich, concurring) (emphasis in original) (Unlicensed when

484    "a reasonable person would conclude that entry onto the curtilage ... by police or others was cat-

485    egorically barred"), Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964) (License may be

486    revoked by "express orders"); State v. Grice, 367 N.C. 753, 762, 767 S.E.2d 312, 319 (2015),

487    State v. Christensen, 131 Idaho 143, 147, 953 P.2d 583, 587 (1998), State v. Christensen, 517

488    S.W.3d 60, 71 (Tenn. 2017) (citing Grice & Holmes), United States v. Holmes, 143 F.Supp.3d

489    616 1252, 1269 (M.D. Fla. 2015) (Corrigan, J.) ("Telling visitors to go away would revoke the

490    implied license"), Jardines, 569 U.S., at 20 (J. Alito, dissenting) (Amendment bars arbitrary po-

491    lice approach to home's "front door in the middle of the night without an express invitation"),

492    United States v. Abarza, 199 F.Supp.3d 1270, 1276 (D. Or. 2016) (Mcshane, J.) (Police "entry

493    into the curtilage of a home late at night without probable cause, a valid warrant, or an express



494    invitation from the occupant, violates the Fourth Amendment"), and Ysasi v. Brown, 3

495    F.Supp.3d 1088, 1098-1099 & 1151-1157 (D.N.M. 2014) (Browning, J.) (Denying summary

496    judgement on "unlawful entry" Fourth Amendment § 1983 claim where physically present oc-

497    cupant advised police "that he did not consent to them entering and remaining on his property");

498    and then cf. Collins, 138 S.Ct., at 1670 (quoting Jardines, 569 U.S., at 6), Sims v. Stanton, 706

499    F.3d 954, 962, n.6 (9th Cir. 2013) rev'd on other grounds in 134 S.Ct. 3, United States v. Tay-

500    lor, 458 F.3d 1201, 1206 (11th Cir. 2006), United States v. Molkenbur, 430 F.2d 563, 566 (8th

501    Cir. 1970), and Oliver v. United States, 466 U.S. 170, 180 (1984) (emphasis added) (Curtilage

502    "warrants the Fourth Amendment protections that attach to the home") with Georgia v. Ran-

503    dolph, 547 U.S. 103, 106 (2006) (A "physically present co-occupant's stated refusal to permit

504    entry prevails" over another occupant's invitation), id., at 111 (Examining validity of invitation

505    with "widely shared social expectations"), Bumper v. North Carolina, 391 U.S. 543, 548, n.11

506    (1968) (No "question of the petitioner's standing to challenge" invasion "in[to] the common

507    part of the house" owned by grandmother), Minnesota v. Olson, 495 U.S. 91 (1990) (Standing

508    for search of another's home), Byrd v. United States, 584 U.S. __, 138 S.Ct. 1518 (2018)

509    (Standing for search of "effect" paid for by another), and Rakas v. Illinois, 439 U.S. 128, 149

510    (1978) (Explaining that defendant in Jones v. United States, 362 U.S. 257 (1960) "had complete

511    dominion and control over" friend's apartment absent consideration "and could exclude others

512    from it" in friend's absence); and then see also Sims, 706 F.3d at 959 ("The Fourth Amendment

513    prohibits officers from entering" curtilage "to the same extent that it prohibits them from enter-

514    ing a home"), United States v. Barajas-Avalos, 377 F.3d 1040, 1055 (9th Cir. 2004), Kirsche v.

515    State, 271 Ga. App. 729, 731, 611 S.E.2d 64, 67 (2005), Payton v. New York, 445 U.S. 573,

516    582, n.17 (1980) (Stevens, J.) (Nonconsensual entry to the sanctity of the home is "the chief evil

517   that the Amendment is designed to deter"), Johnson v. United States, 333 U.S. 10, 14 (1948)

518   (Jackson, J.) (Police thrusting upon homes is "a grave concern"), Silverman v. United States,

519   646 365 U.S. 505, 512 (1961) (Nonconsensual entry by "fraction of an inch" was unlawful), and

520   Olson, 495 U.S., at 95 (Payton stands "not to protect the person ... but to protect his home from

521   entry.") Payton's "'firm'" and Kyllo's "'bright'" lines "govern" the curtilage. See Jardines, 569

522   649 U.S., at 14 (J.J. Kagan, concurring) (quoting Kyllo v. United States, 533 U.S. 27, 41 (2001)

523   & Payton, 445 U.S., at 590); and cf. Entick v. Carrington, 2 Wils. K.B. 275, 291, 95 Eng. Rep.

524   807, 817 (K.B. 1765) (L. Camden) ("[N]o man can set his foot upon his neighbour's close with-

525   out his leave; if he does[,] he is a trespasser") with Boyd v. United States, 116 U.S. 616, 627

526   (1886) (Bradley, J.) (It "may be confidently asserted that" the propositions of Entick "were in

527   the minds of those who framed the Fourth Amendment"), Payton, 445 U.S., at 600 (Respect

528   "for the sanctity of the home that has been embedded in our traditions since the origins of the

529   Republic") accord Semayne's Case, 5 Co. Rep. 91a, 91b, 77 610 Eng. Rep. 194, 195 (K.B.

530   1604) (S. Coke):

531      65.  Riley moreover 'searched' Auditor's property, curtilage, Home, and/or 'house' within

532   the meaning of the Amendment. Riley violated Auditor's legitimate subjective expectation of

533   privacy that society recognizes as objectively reasonable by trespassing upon Auditor's consti-

534   tutionally protected areas to gather information. Riley entered upon and occupied Auditor's cur-

535   tilage without consent in effort and attempt to find Auditor and to also hear and discover words

536   and/or information that Auditor would voice as acknowledgment of Riley's forthcoming lec-

537   ture; and, Riley, at least unconsciously, likewise non-consensually entered and occupied the

538   same to discover and/or dispel suggestions of criminality by, for example, recognizing signs of

539   whether the scent of drugs or drugs themselves could be detected or spotted with enhanced

540    smell-points or view-points resulting from being located upon and around Auditor's curtilage.

541    See People v. Frederick, 500 Mich. 228, 234-242, 895 N.W.2d 541, 544-548 (2017).

542        66.   On or around May 25, 2018, Riley stormed and affixed himself upon Auditor's lawn and

543    Home for a lecture around 2:30 a.m. without a warrant, exigency, probable cause, reasonable

544    suspicion, legal justification, or license and/or free, voluntary, unequivocal, and specific con-

545    sent(implicit or explicit) of which was abided by in scope; and, otherwise, unlawfully entered

546    and occupied, unreasonably searched, and arbitrarily intruded upon the Home and the privacies

547    of Auditor's life, all in violation of Auditor's rights secured by the Fourth and Fourteenth

548    Amendments to the U.S. Constitution.

549        67.   Riley 'seized' Auditor's 'person' within the meaning of the Amendment. Auditor sub-

550    mitted to Riley's intentionally directed show of authority by not running away in response to

551    Riley's approaching and subsequent lecturing of Auditor at Home around 2:30 a.m. after having

552    dismissed Auditor's decree forbidding his approach and command for him to leave Auditor and

553    Auditor's lawn alone, among other factors (e.g., gun, history of police, lack of a witness), as Ri-

554    ley's show would have caused a reasonable innocent resident standing on their lawn to feel they

555    were not free to do or otherwise ignore Riley and go about their business without interference.

556        68.

557            So what do we do if we don't know? I can follow my instinct. My instinct is he
558            would feel he wasn't free because the red light's flashing. That's just one person's
559            instinct. Or I could say, let's look for some studies. They could have asked people
560            about this, and there are none. What should I do? Look for more studies?

561      -Justice Stephen Breyer

562    See David K. Kessler, Free to Leave - An Empirical Look at the Fourth Amendment's Seizure

563    Standard, 99 J. Crim. L. & Criminology 51 (2008-2009) (ellipses omitted) (quoting Transcript

564    of Oral Argument at 43, Brendlin v. California, 551 U.S. 249 (2007) (No. 06-8120) (Breyer, J.)

565    and id. at 44 (Scalia, J.)); see also Alisa M. Smith, Erik Dolgoff, & Dana Stewart Speer, Testing

566    Judicial Assumptions of the "Consensual" Encounter: An Experimental Study, 14 Fla. Coastal

567    L. Rev. 285 (2013) (Building on Harvard J.D. graduate David K. Kessler's authority in Free to

568    Leave), and e.g., Janice Nadler, No Need to Shout: Bus Sweeps and the Psychology of Coer-

569    cion, 2002 Sup Ct Rev 153, 155 (2002). his is the reasonable American civilian facing police.

570    Click. See also Com. v. Dowds, 563 Pa. 377, 390, 761 A.2d 1125, 1132 (2000) (J. Nigro, dis-

571    senting) ("From the moment the police approach a person and identify themselves, the average

572    citizen is" seized); and cf. Randolph, 547 U.S., at 124, n.2 (J. Stevens, concurring) (citations

573    omitted) (Under "many circumstances a reasonable person might read an officer's" friendly

574    smile "as the courteous expression of a demand backed by force of law.")

575    69.  On or around May 25, 2018, Riley involuntarily stopped and/or detained Auditor on his

576    lawn for a State lecture around 2:30 a.m. without a warrant, exigency, probable cause, reasona-

577    ble suspicion, or legal justification; and, otherwise, unreasonably seized Auditor at his Home in

578    violation of Auditor's rights secured by the Fourth and Fourteenth Amendments to the U.S.

579    Constitution.

580    70.  On or around May 25, 2018, Kapka voiced instructions and/or statements of which

581    guided, assisted, impacted, and moved Riley so to deprive Auditor of his rights secured by the

582    Fourth and Fourteenth Amendments to the U.S. Constitution.

### Facts

583    71.  On June 18, 2018, Auditor e-mailed Rowley and informed her that he "ha[d] prepared a

584    complaint" of which was going "to be filed in the U.S. District Court of New Jersey" soon after

585    the "receipt of information" he previously requested a few days prior in relation to Riley's

586    abovementioned conduct. The next day (June 19, 2018), WPF and Wayman created and issued

587   and implemented a brand-new five (5) page policy outlining rules, regulations, and procedures

588   applicable to transporting Auditor (the "Transport Policy") <u>Exhibit R</u>. The Transport Policy was

589   constructed in response to encounters involving Auditor and Police. WPF clarifies in its

590   Transport Policy that it strongly believes that "is not a transport or "taxi" service." Id., at p.5, §

591   II-C ¶ 5 (emphasis in original). The Transport Policy includes a detailed, fully italicized exam-

592   ple of how to handle transportation of intoxicated persons to residences. The Transport Policy

593   would also condemn most of Riley's actions, such as, for example, failure to request and subse-

594   quently obtain supervisor approval for a civilian transport; id., at p.3, § II-B ¶ 1; failure to se-

595   cure a transportee in a seatbelt; id., at ¶ 6; and failure to transport a transportee directly and

596   completely to their intended destination. Id., at p.4, § II-B ¶ 8. Prior to enacting the Transport

597   Policy, WPF had no rules, regulations, policies, and/or procedures relating to civilian transports.

598     72.  WPF's Transport Policy only applies to Auditor. For example: the Transport Policy

599   avers that the WPF "dispatch center shall document" all pre-transport information that a WPF

600   agent is required to radio, and which details: "[a] Their present location; [b] Their intended des-

601   tination; [c] Number of passengers; and, [d] The police vehicle's odometer reading at the start

602   of transport." Id., at ¶ 2. The Transport Policy was distributed to "all personnel." On August 2,

603   2018, however, in response to Auditor's request for (1) (and only one) CAD report denoting a

604   civilian transport, the Town provided a report averring that a civilian was transported on July

605   13, 2018 (apparently nearby a "Seven Eleven Food Store"), which report notes provide in full:

606   "Civilian Transport[,] Transport complete 12:38:47 p.m." <u>Exhibit S</u>.

607     73.  On or around June 29, 2018, at 4:00 a.m., Auditor is visiting C at his house; J is also vis-

608   iting. Auditor is intoxicated due to his consumption of many alcoholic beverages.[4] Auditor is

---

[4] Due to their levels of intoxication, Auditor records a video of J slapping C in the face for fun; Auditor's words are heavily slurred during this video.

Page **28**



609   wearing jeans and a polo shirt. Auditor leaves C's house and begins walking Home. Auditor is

610   walking among Westfield while carrying an empty, sealed, labeled, glass, and approximately a

611   half gallon-sized bottle of Captain Morgan spiced rum. After some brief walking, Auditor stops,

612   hides the bottle behind a small rock, and then calls WPF for assistance. Auditor's identity is

613   known. Auditor asks for a WPF agent to assist him Home because he is intoxicated. Freeman

614   and another police agent are dispatched and arrive at Auditor's location soon thereafter in the

615   same squad car. In turn, Auditor informs these agents that he is intoxicated and asks them to as-

616   sist him Home. Freeman tells Auditor that he is not intoxicated. Auditor subsequently moves

617   towards the aforementioned rock, retrieves the Captain Morgan bottle, holds it up, and then

618   says, "I just drank this." Freeman tells Auditor that WPF will not assist him Home. Afterwards,

619   Freeman and the other agent return to their squad car and drive away. Freeman and the other

620   agent, however, likely than generally do absolutely nothing besides drive around Westfield for

621   about the next 50 minutes as Auditor walks Home. The WPF report summarizing this encounter

622   carefully frames Auditor as having called WPF to merely 'say' that he was intoxicated. Exhibit

623   T. This report also provides in part that Auditor was "not intoxicated;" this is a lie.

### Summaries – Claims – Conclusions

624   74.  Over many years, countless WPF agents (including Police) have used WPF vehicles on

625   numerous occasions for the consensual transportation of individuals, especially white adult

626   American males, some wearing polo apparel, from parities, strip malls, and restaurants located

627   within Westfield, to elsewhere within Westfield such as to motels, train stations, bakeries, and

628   residences, irrespective of whether the transportee is intoxicated, alleged to be violent, appears

629   to be in good health, or has been seen urinating in public and regardless of whether these jour-

630   neys consist of a matter of a few blocks or extend to the farthest ends of Westfield resulting in

631    upwards of 10 minute driving times. See, e.g., <u>Exhibit U</u>[5]. This list is not exhausted.

632        75.   Around 2:00 a.m. on both May 4, and May 25, 2018, respectively, Auditor was standing

633    on St. Marks Ave in Westfield and called WPF for assistance to his Home due to being intoxi-

634    cated. Riley responded and assisted Auditor; O'Keefe and Freeman did not. This fact alone

---

[5] A WPD agent has transported an "adult male," who was alleged to be "violent," "bothering the neighbors," and "passed out" in an apartment building, with a WPD vehicle, from some- where in Westfield, to a local Westfield motel, the "Best Western." This transport was com- prised of approximately 0.5 miles in distance.

On or around August 14, 2013, a WPD agent transported an intoxicated individual, who was "re- fusing to leave" a former Westfield restaurant, "The Office," with a WPD vehicle, from a nearby area within Westfield, to the border of Westfield. This transport took about 11 minutes by drive. O'Keefe and Freeman were present on the scene and participated in the transport.

On or around August 9, 2014, a WPD agent transported "a white male" who "decided to take a nap" by a tree near a strip mall in Westfield or "Bagel Chateau," with a WPD vehicle, from a nearby area within Westfield, "to the [Westfield] train station" located nearby.

On or around December 24, 2014, a WPD agent transported a "white male" who was around the time "seen urinating in the bushes by the bank," with a WPD vehicle, from a nearby area within Westfield, to a local Westfield bakery of which Plaintiff was once employed as a dish- washer during high school or, "Bovella's."

On or around March 17, 2017, Martinez "transport[ed] 1 adult male" from an "all adult party" which presented "no issues," with a WPD vehicle, from somewhere in Westfield, to an area lo- cated elsewhere within Westfield about seven (7) minutes away by drive.

On or around June 11, 2017, a WPD agent transported "1 adult male" who "[wa]s not intoxi- cated" and "appear[ed] to be in good health," with a WPD vehicle, from somewhere in West- field, to an area located elsewhere within Westfield about six (6) minutes away by drive. Force- nito was present on the scene and participated in the transport.

On or around June 24, 2017, a WPD agent transported an intoxicated "white male wearing a polo," with a WPD vehicle, from somewhere in Westfield, to an area located elsewhere within Westfield about one (1) minute or a few blocks away in driving distance. Martinez was present and participated in the determination to transport and the transport itself.

The events described in this footnote were consensual.

635  supports an inference that O'Keefe and Freeman hold some dislike for Auditor because of, for

636  example, Auditor having filed a federal lawsuit against them and their employer. Prior to Audi-

637  tor's filing of said lawsuit, on June 27, 2017, O'Keefe, Freeman, and Martinez were so enthusi-

638  astic about transporting Auditor Home on suspicion of him being slightly under the influence of

639  alcohol that they involuntarily compelled his transportation over his numerous objections. Yet,

640  after Auditor filed his lawsuit against said agents, on January 12, May 4, and June 29, 2018, re-

641  spectively, O'Keefe, Freeman, and Martinez apparently rather have been doing any activity

642  whatsoever (including driving nowhere for hours) than assist Auditor with anything.

643  76.  On or around January 12, May 4, and/or June 29, 2018, respectively, O'Keefe, Freeman,

644  and Martinez, around said applicable dates and/or times, selectively, wholly irrationally, and in

645  furtherance of no legitimate government interest, denied and refused Auditor the same assis-

646  tance, gifts, services, benefits, functions, and activities that he qualified to enjoy, activities of

647  which countless WPF agents (including Police) have supplied numerous similarly situated indi-

648  viduals (including Auditor's past selves), as a result of some animus towards Auditor or his

649  class of one; and, otherwise deprived Auditor of Equal Protection of the Laws in violation of

650  Auditor's rights secured by the Fourteenth Amendment to the U.S. Constitution

### Facts

651  77.  In June of 2018, Congress proposed legislation (H.R. 6054, 115th Cong., 2d Ses.) titled:

652  Unmasking Antifa Act of 2018. This bill was sponsored by U.S. House of Representative Dan-

653  iel Donovan and co-sponsored by Representatives Peter King, Theodore Budd, and Paul Gosar;

654  the bill is aimed at targeting and severely penalizing the mere wearing of a mask.

655  78.  On or around July 1, 2018, at 4:00 a.m., Auditor walked into the lobby of WPF head-

656  quarters. About 100 civilians enter and walk about this area per day. Auditor, thinking of Fields

/S/
III

657    v. City of Phila., 862 F.3d 353, 359-360 (3d Cir. 2017), began recording police activity with his

658    iPhone. The first WPF police agent Auditor encountered, who was standing behind a bullet-

659    proof glass window inside of the command center room affixed to the lobby, informed Auditor

660    that he enjoyed permission and authorization to film in the lobby. O'Keefe was also located in

661    WPF's command center room and, considering Westfield has an extremely low crime rate,

662    O'Keefe somewhat predictable informed Auditor that "nothing" was going on in Westfield.

663    O'Keefe likewise revealed that he had been briefed on Riley's transportation of Auditor to his

664    Home and/or O'Keefe talked about "what Officer Riley did." Auditor apprised O'Keefe that he

665    was preparing another lawsuit against him; O'Keefe got upset and said that Auditor has "no rep-

666    utation" and conveyed that therefore, it cannot possibly be tarnished by anyone. Yet, Auditor

667    eventually left WPF and returned Home.

668    79.  On July 4, 2018, Auditor travels into Manhattan to watch the Macy's Independence Day

669    Firework Show. Auditor ultimately attends the New York City Police Department annual 4th of

670    July party on the helipads affixed to the East River.

671    80.  The next day, on July 5, 2018, Auditor boards the Raritan Valley Line at the Westfield

672    train station and rides the train into Newark Penn Station. And, like his procedure Auditor has

673    performed with nearly every single paper he has ever filed in the U.S. District Court of New

674    Jersey, Auditor leaves the train terminal, walks past the Prudential Center, enters the Federal

675    Courthouse, and files suit pro us against the Government in the Clerk's Office on of that Martin

676    Luther King Building, this time against the Town, Wayman, O'Keefe, Martinez, Freeman,

677    Johnson, Riley, and Maloney. See Me v. Township of Westfield, No.: 18-cv- 11343-JMV

678    (D.N.J. July 5, 2018). Mr. Guss later-on conveyed that he would accept service on behalf of all

679    the police agents. Posyton II is still pending as of here.

680    81.   On or around July 12, 2018, 10:00 a.m. and July 13, 2018, 11:00 a.m., respectively, Au-

681    ditor enters WPF's lobby and records police activity for approximately 10-minute time spans.

682    82.   On or around July 14, 2018, 4:30 a.m., Auditor entered WPF headquarters and video

683    recorded a brief encounter with WPF sergeant Bradford Brien. Exhibit V.

684    83.   On or around July 15, 2018, at 3:30 a.m., Auditor entered WPF's lobby. O'Keefe and

685    Freeman were inside the command center. Around this point herein, WPF literally begin their

686    attempts in covering up their activities linked to Auditor right before Auditor's very eyes;

687    O'Keefe and Freeman started attaching very large pieces of yellow note-pad paper to the one

688    and only giant bulletproof glass window offering sight from the lobby into WPF's command

689    center. Auditor stood next to the yellow padded paper window with his back turned against it

690    sometime after the window had been entirely covered by paper; O'Keefe observed and was

691    aware of Auditor's location due to viewing of a security camera video feed of WPF's lobby that

692    was being displayed in the command center room. As Auditor silently stood really close by the

693    papered window with his back faced against it, O'Keefe angrily slapped the glass with incredi-

694    ble force and caused an extremely loud booming noise which prompted Auditor to quickly hop

695    away from the window and blurt out in mid-hop, "Oh shit." Exhibit W.

696    84.   Afterward, on said date, O'Keefe stealthily attempted to contact Auditor's Mother to in-

697    struct her to come to WPF headquarters and to then remove Auditor; O'Keefe likely dialed and

698    called (908) 317-5606. During this call, O'Keefe learned that this number is either nobody's

699    phone number or simply not a number connecting to Auditor's Mom. The number (908) 317-

700    5606 is an ancient and non-working Auditor family land-line number. Next, O'Keefe started re-

701    petitively telling Auditor that he would happily call his Mother (around 3:30 a.m.) and 'ask' her

702    to come to WPF headquarters so to thereafter transport Auditor Home if Auditor so approved of



703    this plan. Auditor objected to any police ever contacting any members of his family, and Audi-

704    tor also advised O'Keefe to leave his Mother alone. O'Keefe just kept babbling to himself over

705    and over again saying that calling Auditor's Mom was no problem at all. O'Keefe moreover

706    continued alerting Auditor that he had even already pulled up his Mom's phone number on a

707    screen and was staring right at it – (908) 317-5606 – and kept saying that he was going to dial

708    this number (presumably sometime after needing to read these numbers out-loud to himself a

709    few times because he is slow and needed to focus on the dials). Auditor ultimately left and re-

710    turned Home. Auditor has not provided his family's contact information to police.

711        85.    Successively, WPF agents launched an investigation devoted to discovering a working

712    phone number connecting to Auditor's Mother. WPF agents found the permanently restricted

713    and/or always blocked cell-phone number connecting to Auditor's Mom; this number is de-

714    signed to always hide caller identification, so nobody can find it, so nobody can call it.

715        86.    On or around July 16, 2018, 11:00 p.m. or so, T invites Auditor to visit his house. T

716    picks-up Auditor who both then go to T's house and met J.C. and P and J.M. who would be at

717    T's house. And, from about 12:00 a.m. to 4:00 a.m., T, Auditor, J.C., P, and J.M. drank wine,

718    and played drinking and video games, generally.

719        87.    On or around July 17, 2018, at 1:15 a.m., Auditor left his Home and began walking to-

720    wards WPF headquarters. Auditor encountered a few WPF agents (including Forcenito) sitting

721    in two (2) squad cars stationed on Central and located near Auditor's Home during his journey

722    to WPF headquarters. When Auditor entered WPF's lobby around 1:40 a.m., the giant yellow

723    note-pad paper had already been placed over the command center room window. While Auditor

724    kept to himself inside the lobby, Padovano exited the command center room and entered the

725    lobby by using the only door directly bridging the divide between such rooms. Auditor and

726   Padovano spoke for a few minutes, seemingly in a friendly manner. Auditor then asked Pado-

727   vano if he knew of Auditor's identify; Padovano answered in the negative and said he had "no

728   idea" of Auditor's existence, notwithstanding that Padovano had just previously exited WPF's

729   command center room where giant yellow pad paper had been lying around for some time cov-

730   ering and affixed to a large area within WPF's command center. Auditor ultimately left WPF

731   around 2:00 a.m. and returned Home about 25 minutes later.

732   88. On or around the same date, between 2:50 a.m. and 2:58 a.m., a Delta or Westfield

733   Coastal gas station located in a secluded area of Westfield at 801 South Avenue, Westfield, NJ,

734   may have been 'broken into' by some unknown and unseen actor(s); such purported crime may

735   have been reported around 6:30 a.m. later-on in the day. No property was reported stolen.

736   89.  On or around the same date at approximately 3:30 a.m., after having returned Home

737   from WPF headquarters, Auditor again left his Home and returned to WPF around 4:00 a.m. or

738   so. O'Keefe was inside WPF's command center room and, sometime after Auditor arrived,

739   O'Keefe stealthily called Auditor's Mother on her hidden cell-phone number and aroused her

740   out of bed. O'Keefe suggested, asked, instructed, and/or commanded Auditor's Mother to drive

741   to WPF headquarters and remove Auditor by transporting and remanding him to the Home; Au-

742   ditor's Mother agreed to participate and to do as O'Keefe wished and/or directed.

743   90.  Auditor's Mom drove to WPF headquarters and arrived soon thereafter, appeared and

744   presented herself before Auditor and O'Keefe, and commanded Auditor to enter her vehicle so

745   to be transported and remanded Home. Auditor did not feel free to do and complied with his

746   Mother's directions by entering her vehicle. Auditor's Mom transported Auditor Home and sub-

747   sequently instructed Auditor to enter the Home and remain inside thereof; Auditor complied

748   with his Mom's directions and remained inside the Home for many hours thereafter.



## Summaries – Claims – Conclusions

749   91.   O'Keefe supplied significant encouraging persuasion and asserted tremendous overt co-
750   ercive pressures about Auditor's Mom of which induced and compelled her into implicitly and
751   explicitly agreeing to jointly participate in the effectuation of a State orchestrated plan devised
752   to transport and remand Auditor to a secluded location designated by the State. Any reasonable
753   loving Mother contacted by Police around 4:00 a.m. would feel obligated to participate in a plan
754   designed to remove her child from a place embedded with numerous armed individuals affili-
755   ated with an incredibly powerful organization of which at times engages in dangerous and
756   deadly unlawful activities. Auditor's Mother was operating as a de facto State agent under color
757   of law during the performance of all acts undertaken in furtherance of her and O'Keefe's im-
758   plicit and explicit transport and housing agreement.

759   92.   Auditor's Mom 'seized' Auditor's 'person' within the meaning of the Amendment. Au-
760   ditor submitted to his Mother's intentionally directed show of authority by entering her vehicle
761   and the Home thereafter and remained inside thereof in response to his Mom's commands to do
762   so, among other factors, as Mother's State guided show caused Auditor to believe that he was
763   not free to do or ignore his Mother and go about his business.

764   93.   On or around July 17, 2018, O'Keefe, by and through the actions of Auditor's Mother
765   undertaken pursuant to O'Keefe's suggestions and instructions in furtherance of an implicit and
766   explicit agreement between her and O'Keefe, did involuntarily stop Auditor in public and sub-
767   ject Auditor to a *de facto* House arrest and/or detention without a warrant, exigency, probable
768   cause, reasonable suspicion, or legal justification; and, otherwise, unreasonably seized Auditor
769   in public and at his Home in violation of Auditor's rights secured by the Fourth and Fourteenth
770   Amendments to the U.S. Constitution.



**Facts**

771    94.  Around 1:30 a.m. on Wednesday, July 18, 2018, Auditor was listening to Fifth Harmony

772    and the like on a couch at Home after finishing a 2nd shift at 7-Eleven. And, Auditor was sober

773    and bored so, Auditor threw on a grey stripped Jos. A. Bank suit jacket and blue button-down

774    dress shirt, yellow tie, GAP jeans, and brown Cole Haan Hamilton Grand Wingtip Oxfords; Au-

775    ditor also partially stuffed a white handkerchief into his suit jacket's upper-left-hand-side

776    pocket-square. And, ultimately, Auditor came across a large, solid blue, New York Giants foot-

777    ball thick winter-like hat in the basement and, accordingly, Auditor then transformed this Giants

778    hat into a viable face-mask by using a long serrated kitchen knife he obtains as a Cut-Co sales-

779    man, to repeatedly stab this hat and slit two (2) eye holes into the cloth. The newly spawned

780    MASK fit Auditor very well, covered his entire face, and fully extended down to his neck-line.

781    95.  Around 1:45 a.m., Auditor exited his Home and then placed the mask over his head and

782    1023 face about 30 seconds later. Auditor walked to the end of Carleton; turned right onto

783    Grove; walked towards and made a left onto Central; and casually walked along the sidewalk on

784    Central in the direction towards downtown Westfield.

785    96.  Around 1:58 a.m., after having walked about one (1) mile in the mask, Auditor began to

786    near a non-operating Raceway gas station or 400 Central Avenue.

787    97.  The Raceway is located about 850 feet away from the platform of a medium-size opera-

788    tional train station in one direction and is located about 850 feet away from the beginning of a

789    strip-mall in the opposite direction. The Raceway is also located about 150 feet away from a

790    five (5) story apartment building in another direction. There are small businesses scattered all

791    around the Raceway. The Raceway is located at the intersection of Central and South Avenue;

792    this intersection might be one of the most traveled areas in Westfield. The Raceway employed

793    no illumination and was almost entirely covered by darkness. An Exxon gas station or 421 Cen-

794    tral Avenue was also located at the intersection of South and Central.[6] The Exxon is located di-

795    rectly across the street from the Raceway. At the time, the Exxon lot was a non-operating and

796    closed-down gas station and its gas pumps were under renovation and/or construction; said

797    pumps were completely surrounded by fencing. A canopy stands high above and over top of the

798    Exxon pumps; about half of the lights fixated inside this canopy of which normally shine down

799    over the gas-pumps were not operating. There was one faint street lamp operating or illuminat-

800    ing some part of Central between the Raceway and the Exxon. There is a structure or building

801    located near the back corner of the Exxon lot; around this time, this building contained a non-

802    operating Dunkin Donuts located on one side within this building, and also contained a closed-

803    down and cleaned out (or previous) Tiger Mart convenience store located on the other side

804    within the building. (The Exxon or Dunkin Donuts/Tiger Mart building is referred to as the

805    Tiger Mart herein). The Tiger Mart employed a few lights of which were illuminating some of

806    the area immediately surrounding its structure. There is a narrow pathway (the "Path") affixed

807    directly against and around the brick Tiger Mart building. The Path is equipped with about four

808    (4) foot high guard rails positioned upwards on the side of the Path opposite to the building. The

809    Path starts and runs along the back of the Tiger Mart, leads to a sharp 90-degree right-turn (the

810    "Turn") which rounds the Tiger Mart building, and then the Path leads in a straight direction to-

811    wards and into the Exxon lot. There are many large plants, bushes, or small trees lined against

812    or stationed alongside the back of the Tiger-Mart of which obscure and/or conceal the Turn and

813    the entire Path itself when viewing the back-side of the Tiger-Mart.

---

[6] The Exxon station is now an Amoco gas station, and other surroundings have changed since this matter's date; for clarification, this pleading will only refer to the elements present and sur- rounding factors of this matter of which existed at the time of the events described herein



814    98.  Around this time and always relevantly hereafter, no person or vehicle was located any-

815    where near this area's vicinity, and no business was operating. The area was dead and silent.

816    99.  Auditor closed upon and began to walk past 414 Central Avenue (or the business located

817    right next to the Raceway). Around this time and slightly prior thereto, a vehicle was approach-

818    ing this area, from the north. This vehicle reached and entered about the intersection of South

819    and Central as Auditor likely neared, reached, and/or passed the properly line between 414 Cen-

820    tral and the Raceway lot. This vehicle began to slowly, steadily, and methodically roll towards

821    an entrance to the vacant, non-operating Raceway station affixed to Ross Place, and principally

822    located somewhat diagonal to Auditor around here. Auditor could not see any decal or logo on

823    this vehicle from where he was about, but he knew it had to be police.

824    100.  This vehicle was a WPF squad car driven by Gill and accompanied by Forcenito.

825    101.  Around the time Police were entering and about the intersection of South and Central,

826    Auditor was located around an almost entirely blacked-out area. Objects and things located

827    around Auditor and Police about their corresponding routes included two (2) short but some-

828    what leafy or bushy trees, a street-light post stationed in-between said trees, a traffic-light post

829    and a New Jersey Garden State Parkway signposted thereto, a traffic speed-limit sign located

830    adjacent to said tree nearest to South and Central, and a 'one way' traffic sign. Additionally, as

831    Police closed upon and began pulling into the Raceway's Ross Place entrance on a route closely

832    going up alongside the edging of that entrance nearest Central, a large brick wall stationed on

833    the Raceway lot and its above sitting signage displaying gas prices and a Raceway logo also be-

834    came directly in-between Auditor and Defendants locations. The Raceway wall and signage is

835    about seven (7) feet wide and seven (7) feet tall; there was also a lamp-post standing directly ad-

836    jacent to the Raceway wall together with a couple very short and tiny bushes nearby.

837    102.  As Auditor was casually walking along the sidewalk laid over the Raceway lot entrance

838    affixed to Central and located furthest away from South and Central, and very soon or almost

839    immediately after the State began pulling into the Raceway Ross Place entrance, Auditor said,

840    "Alright, here we go," and then quickly accelerated into a full-blown sprint.

841    103.  Auditor bolted across Central towards the Exxon lot; he cut over some part of the Exxon

842    en route to South Ave; he reached South Ave and began traveling along its sidewalk and away

843    from Central; he redirected himself from South Ave to the back of the Tiger Mart; he ran down

844    the Path under cover of its small adjacent trees, skillfully rounded its Turn, and continued down

845    the Path leading strait to the Exxon lot: Auditor essentially ran around in a giant circle.

846    104.  The Police gave chase, eventually. Gill exited the Raceway lot onto Central by using the

847    lot's entrance/exit located furthest away from South and Central. The squad car's engine loudly

848    revved as Gill drove in a straight direction down Central and headed towards the intersection of

849    South and Central. The State's engine went soft as Gill turned onto South Ave but it began rev-

850    ving loudly once again as Gill started speeding down this avenue. Around here, Gill radioed

851    and/or beeped WPF requesting to make a report. Police thereafter lost all sight of Auditor for at

852    least 12 seconds following the moment Auditor skillfully rounded and maneuvered the sharp

853    Turn at a high rate of speed. Gill ultimately stopped the WPF squad car on South Ave, and For-

854    cenito exited and began pursuing Auditor on foot. Forcenito headed towards the back of the

855    Tiger Mart and its Path; and, Gill routed his vehicle in some direction.

856    105.  After Auditor sharply cut around the Tiger Mart, Auditor maybe could have continued

857    sprinting into the Exxon lot, turned left, and then just darted through a gate located behind a tall

858    wall of bushes and about 15 feet away from the Path's entrance into the Exxon lot. This route

859    leads to 443 Central Ave and, at the time, going down this route would have offered Auditor a



860  multitude of other running routes, hiding places, possibilities, and also more exercise time; and,

861  ultimately, Auditor would have undoubtedly out-moved Westfield Police, and would have law-

862  fully gotten away. Auditor, however, felt compelled to yield and allow Police to catch-up. Dur-

863  ing the approximately 12 seconds Police had lost sight of Auditor following the Turn, Auditor

864  soon began decelerating over some part of the Path leading to the Exxon lot. Auditor thereafter

865  casually and/or slowly walked out and about the Exxon lot for about the next five (5) seconds in

866  a straight direction towards the Raceway, and Auditor then began to lightly jog in the same di-

867  rection, or strait towards the Raceway for about the following two (2) seconds. As of this point,

868  the State had not directed any explicit direction towards Auditor (and especially not any type of

869  direction supported by any remote volume or clarity), but there was most certainly a Police

870  show. Auditor never looked back or over his shoulders or behind himself to see anything as he

871  ran because the revving of the squad car's engine was more than enough for Auditor.

872      106.  Forcenito rapidly traveled into the Path and headed towards its sharp 90-degree right-

873  Turn. As Forcenito entered and simultaneously began attempting to maneuver this Turn, Force-

874  nito commanded Auditor, for the first time, to "stop," just around the same time Forcenito ran

875  straight into the guard-rails attached to the Turn; this collision caused Forcenito's "stop" com-

876  mand to come out very faint and soft. In any event, Auditor afterward no longer felt free to do

877  whatever at all. Auditor complied with Forcenito's order in near-instantaneous fashion by ceas-

878  ing all movement; Auditor also quickly spun his head around to see Police and, as a result, Au-

879  ditor saw Forcenito tumbling away from the Path's guard rails around its right-Turn, and also

880  saw Forcenito continue to tumble about the Path for a brief period thereafter. Forcenito gener-

881  ally tumbled around with a hunched back and with his head facing and looking towards the

882  ground or, otherwise looking at the Tiger Mart's solid brick wall located right next to his face as



883  he tumbled in that direction. Before Forcenito could collect himself and before he had caught

884  anything more than a slight glimpse of a figure in the distance, as Forcenito tumbled about this

885  Path, Forcenito asked Auditor, "Why you running?" Next, about a split second later, Forcenito

886  looked towards and at Auditor and, for the first time, observed and/or recognized that the person

887  Police saw running around was wearing a mask covering their entire face; Forcenito immedi-

888  ately thereafter demanded, "Let me see your hands." Auditor threw his left-hand straight up into

889  the sky and Auditor also let Forcenito see his other hand in which he was holding his iPhone.

890  Auditor soon shifted his body around towards Forcenito who stood about 10 feet away. Despite

891  the solid blue mask, Forcenito immediately recognized Auditor's identity within about one (1)

892  second after issuing his 'show hands order,' saying, "Aah." Forcenito shined a flashlight at Au-

893  ditor and asked Auditor, "You kidding me? You kidding me, right? Wh – why you got the mask

894  on your face? Why you running around with a mask on?" Auditor began to slowly walk towards

895  Forcenito as he removed his mask and nonchalantly asked, "Am I being detained?" Around

896  here, Gill began broadcasting over WPF's radio frequency: "South and Central Dunkin Donuts

897  parking lot. We have an individual running, from the gas station parking lot, on foot. Also For-

898  cenito's out with him now." Forcenito dismissed Auditor's attempt to elicit unequivocal confor-

899  mation that he was seized for the record, and instead asked Auditor, "What are you doing at the

900  gas station?" Auditor asked Forcenito, "Am I being detained?" Forcenito thereafter responded

901  in the affirmative and said, "Ya," and subsequently asked Auditor, "Why you at the gas station?

902  Why do you have a mask on?" Auditor declared, "I want an attorney." Forcenito continued to

903  question Auditor and asked Auditor, "Why are you at the gas station with a mask on?" Auditor

904  responded, "I want an attorney." Forcenito asked Auditor, "Why are you at the gas station with

905  a mask on?" During these 45 seconds Forcenito engaged Auditor, Gill drove his squad car into

906    the Exxon lot and parked it near Auditor and Forcenito; exited his vehicle; observed Auditor

907    holding a piece of blue cloth and thought nothing of it; casually approached Auditor and Force-

908    nito; and ordered Auditor to move towards a curb about 15 feet away and to then sit on the

909    ground next to the Exxon building. Auditor complied and relocated to the ground; Gill and For-

910    cenito followed Auditor. As Gill began to stand near and shine a flashlight in Auditor's face,

911    Forcenito said, "I'm gonna get O'Keefe," and radioed WPF requesting to "send a boss." At the

912    same time, Gill asked Auditor, "What are you doing man? Why you running around?" Auditor

913    declared, "I really want an attorney." Gill acknowledged Auditor's demand, saying, "Ok." Gill

914    and Auditor remained silent for about the next 15 seconds while Forcenito radioed that he and

915    Gill were "code 4;" code 4 indicates that no further assistance is currently needed. Gill asked

916    Auditor, "Why you running from the gas station parking lot?" which question was thereafter

917    supplemented by Forcenito with the language: "With a mask on your face?" Auditor declared,

918    "I want an attorney." Forcenito walked towards the WPF cruiser parked about 30 feet away. Se-

919    quentially, Gill said: "Well, at this time then I'm gonna make you aware of your rights. You

920    have the right to remain silent. Anything you say can and will be held against you in a court of

921    law. You have the right to an attorney. If you cannot afford one, one could be appointed to you.

922    Do you understand that? Do you understand your rights?" During and briefly after Gill's ap-

923    proximately seven (7) second 'right' advising as he meaninglessly looked elsewhere at times,

924    Auditor made no gesture or sound and sat mute and almost motionless on the ground either

925    looking at Gill or off into space; as Auditor remained virtually lifeless, Gill said, "Ok – – We're

926    gonna have a supervisor come out and well take it from there." A few moments later, as Force-

927    nito stood near the WPF cruiser, Forcenito said for Gill to "read [Auditor] his rights;" Gill re-

928    sponded that he "already did," and then Forcenito called O'Keefe. Next, Gill said that what-

929    ever Auditor might have been doing, it was "not good." Auditor asked, "What? To exercise

930    freedom and liberty?" Gill said, "Ok – we've had some weird stuff going on around here with

931    people breaking into stuff." Auditor asked Gill whether the "stuff" happened "recently?" Gill

932    apprised Auditor that the "stuff" happened "last night." Auditor asked Gill whether any "stuff"

933    happened "in the last hour?" Gill said, "No, but," and then Auditor interjected and said, "Ok."

934    Gill said that Auditor's prior actions were at least "a little bit suspicious." Auditor advised Gill

935    that he was engaged in "privileged activity." Gill informed Auditor that he would "argue that"

936    the circumstances were "suspicious." During Gill's aforementioned engagement with Auditor,

937    Forcenito spoke with O'Keefe over a recorded line and said, "Hey sarg." O'Keefe asked,

938    "What's up?" Forcenito said that he and Gill were "passing by the gas station, the Exxon, and

939    we see someone run with a mask on his face and start running, down Central. So we follow him.

940    Gill runs around. I get out of the car (intelligible). He runs behind the Target Mart, Dunkin Do-

941    nuts. I run after him – and he stops. Mask on his face. And then I walk up to him and he put his

942    hands in the air. And it's Posyton." O'Keefe's first question into this matter inquired into "what

943    kind of mask" had Auditor been wearing; Forcenito said that it was a "ski-mask." Forcenito also

944    informed O'Keefe that Auditor complied with every command; Forcenito said, "I told [Auditor]

945    to stop and he stopped." O'Keefe asked Forcenito whether the "Exxon" had been "burglarized;"

946    Forcenito said that he and Gill "didn't check yet." Forcenito apprised O'Keefe that he and Gill

947    currently "ha[d Auditor] seated down on – at the Target Mart," and said that Auditor was hold-

948    ing his phone. O'Keefe conveyed that Auditor could not have his phone because it "could be

949    used as a weapon" against Police in this Court. Forcenito asked O'Keefe whether he and/or Gill

950    should remove the 'weapon' from Auditor's possession; O'Keefe answered in the affirmative

951    and said, "Ya, tell [Auditor] that the [weapon] has to be put to the side for now. And I'll be

952 responding out there." O'Keefe and Forcenito ended the call. This occurred within three (3) and

953 30 seconds from "stop." See generally Exhibit X; see also Exhibit Y at 0-3:27.

107. After the aforementioned call concluded, Forcenito apprised Gill that Auditor could not

955 have his phone. Gill then apprised Auditor that he could not have his phone as Forcenito walked

956 towards and reunited with Gill. In turn, Auditor placed his cell-phone on the ground away from

957 his person and advised Forcenito and Gill that they could not touch Auditor's iPhone. Next, Au-

958 ditor informed Forcenito and Gill that he wanted to call his attorney on his iPhone; Police told

959 Auditor that he could not contact an attorney. Successively, Forcenito and Gill apprised Auditor

960 about a purported burglary that might have previously occurred at the Delta station or in a sub-

961 stantially more secluded part of Westfield once upon a time; Forcenito and Gill likewise re-

962 sumed questioning and probing Auditor for information concerning his mask, motive, and/or

963 activities (e.g., 'Why you wearing a mask'). Auditor thereafter said that he would articulate dur-

964 ing this matter in exchange for promises and guarantees prescribing that anything Auditor said

965 neither would nor could ever be used or relied upon by government or affiliates, notwithstand-

966 ing anything whatever. In want of information and knowledge that Auditor did not burglarize a

967 gas station or commit any other serious crime, Forcenito promised and guaranteed Auditor the

968 same on his status and agreed and did issue securities by saying with the utmost sincerity, "Ok."

969 After Auditor had acquired and enjoyed a statement shield or some form of immunity, Auditor

970 said that he was wearing a mask and ran from the Raceway hoping that police would voluntarily

971 cause a "chase" (or pursuit) and, if so, film that pursuit. Both Forcenito and Gill appeared

972 slightly flustered after Auditor mentioned a "Raceway." This occurred around 2:04:30 a.m.

973 and/or before any other Police arrived at the Exxon.

108. Afterward, around 2:05:30 a.m., Martinez drove into the Exxon lot and approached and



975   then stood silently near Forcenito and Gill and around Auditor.

976     109.   As Martinez was standing somewhat near Gill, Forcenito, and Auditor, but before Mar-

977   tinez had said anything, Martinez looked at the device attached to Gill's squad car which indi-

978   cates whether a vocal mic is recording; Martinez recognized that nothing had been or was being

979   recorded by Gill's vocal mic. About 20 seconds later, Forcenito began to approach Martinez to

980   brief him on this matter; Martinez immediately looked away from Forcenito as he began to ap-

981   proach him, and also stared in that total opposite direction of Forcenito and continued to look in

982   this direction for a few seconds after Forcenito had begun to brief Martinez on this matter (be-

983   cause Martinez wanted no part of this matter). Forcenito informed Martinez that he and Gill

984   "s[aw] a guy in the [Raceway]. All of a sudden, he takes off running." Martinez did not say a

985   single word in response to Forcenito's briefing. Soon thereafter, Forcenito walked back towards

986   Auditor but Forcenito then once again began speaking to Martinez from about five (5) feet

987   away; during this time, Martinez stealthily attempted to alert Forcenito that Gill's vocal mic was

988   not recording in vaguest manner possible – Martinez looked down at his own mic for a split sec-

989   ond. Forcenito, who was staring right at Martinez essentially did not notice that Martinez had

990   even moved. Gill, however, who was standing nearby, caught a fraction of Martinez's split-sec-

991   ond movement directed at Forcenito as he looked in Martinez's direction at this time, and then

992   looked straight at his squad car's mic device. Gill recognized that his vocal mic was not record-

993   ing, but nevertheless implied that it was recording, and said, "I'm miced-up." Martinez, who

994   had previously noticed the device's inactivity moments prior, and from a further distance away

995   from where Gill stood, said, "It's not recording though." Gill said, "Oh, no – alright," and then

996   looked straight down at the ground for a few seconds. Forcenito thereafter moved to activate his

997   and Gill's video/audio car recorder and Martinez then started to walk away and use his fist to



998 lightly hit himself in the back about seven (7) consecutive times. See Exhibit Z at 0-2:39.

999  110. Successively, Martinez, Gill, and Forcenito all decided to do nothing other than wait

1000 around at the Exxon until O'Keefe arrived. Martinez's reasoning for this course of action pro-

1001 vided in full: "I'll wait till O'Keefe comes. So that way:"

1002  111. Over about the next five (5) minutes: Auditor asked, "Can I film?" Both Gill and Force-

1003 nito said, "No." Auditor said, "I want to contact my lawyer." Gill said, "You can't contact any-

1004 one." Auditor said, "I just went for a run." Martinez stood mute during this period, and Martinez

1005 would never say a single word to Auditor throughout this matter. See Exhibit Za at 0-4:30.

1006  112. Around 2:12 a.m., O'Keefe arrived at the Exxon lot, parked his squad car on Central,

1007 and began to approach the other parties. O'Keefe stopped some distance away from these par-

1008 ties and Forcenito walked towards O'Keefe and both Forcenito and O'Keefe conversed for

1009 about one (1) minute away from the other parties.

1010  113. While Forcenito and O'Keefe spoke, Auditor attempted to convey to Gill that he "was

1011 going on the sidewalk" and began running when "a sign like at the gas station" was suppressing

1012 his visibility of Police and limited him to only being able to "s[ee] the lights" of the WPF quad

1013 car illuminating around the outline of this "sign" (or Raceway wall). Id., at 5:13-34.

1014  114. O'Keefe determined that this matter needed to be disposed of by first looking for ran-

1015 dom specks of crime, and if no speck could be found, send Auditor to a detention/camp center.

1016  115. The following exchanges occurred while the other agents stood and listened.

1017 O'Keefe: What's goin' on?
1018 Auditor: Just running. Just takin' a jog.
1019 O'Keefe, With a mask on?
1020 Auditor: Ya.
1021 O'Keefe: On a balmy night like this? Do you think that's rational behavior?
1022 Auditor: It's privileged activity. You gonna take me in?
1023 O'Keefe: No – I'm gonna call your Mom.

1024    Id., at 5:38-58.

1025        116.  Around 2:13:30 a.m., O'Keefe instructed Martinez to "check the businesses." Mar-

1026    tinez began the process of driving around Westfield looking for specks of crime. O'Keefe

1027    broadcasted over WPF's radio frequency that Police were "on a 10-31," or just a casual 'miscel-

1028    laneous investigation.' O'Keefe averred it is "undisputed" that the State had 'no knowledge'

1029    and had 'not seen' any conduct suggesting Auditor to be involved in any wrongful act,[7]

1030    O'Keefe nevertheless radioed and instructed Freeman and WPF police agent Nicholas Bagan to

1031    drive all about Westfield in their respective squad cars to also look for specks of crime; Free-

1032    man and Bagan did as O'Keefe instructed. Auditor was to be accused of any and all

1033    crimes linked to any potential speck of crime of which might be discovered somewhere hiding

1034    in West field; no speck was ever found and/or "everything east from Boulevard [wa]s clear."

1035        117.  Around 2:15:15 a.m., O'Keefe inquired into whether the man purportedly seen fleeing

1036    from the non-operating gas station in a 'ski-mask' around 2:00 a.m. had been "patted-down"

1037    yet. Gill said that Auditor had not been 'patted-down' yet. O'Keefe instructed Forcenito and/or

1038    Gill to "pat [Auditor] down." In response, Auditor raised and placed his hands up and out in a

1039    surrendering or submissive manner and stood up off the ground. Forcenito took hold of Audi-

1040    tor's hands and placed them behind Auditor's back. As Forcenito was asking Auditor whether

1041    he "ha[d] any weapons on" his person, O'Keefe said, "Just pat [Auditor] down. Don't go

1042    through [or bother with the process designed for those suspected of being dangerous]." Force-

1043    nito said, "I'm gonna pat you down," and Auditor acknowledged Forcenito's advisement and

1044    said, "Ok." Forcenito felt Auditor's entire person with his hands; Auditor did not resist. No

1045    weapons or illegal items were found on Auditor's person. Forcenito instructed Auditor to "have

---

[7] At WPF headquarters around January 15, 2019, 6:00 p.m.

1046  a seat" after he had finished frisking Auditor; Auditor complied and sat back down on the

1047  ground and then O'Keefe walked away towards Central. Prior to this time (around 2:15:30

1048  a.m.), Auditor had yet not been touched by Police.

1049    118.  Auditor advised Forcenito and Gill, "This is freedom: I can run with a mask on if I want

1050  [when no people are looking]," and informed the State that "People wear masks" – just look at

1051  "Halloween."

1052    119.  Around 2:18 a.m., after having walked away Auditor, Gill, and Forcenito, O'Keefe re-

1053  turned and said that Auditor was going to be "taken" for camping. This, however, would no oc-

1054  cur unless and until Police concluded that Westfield was crime-free.

1055    120.  The following exchanges occurred immediately thereafter.

1056  Auditor: You're takin' me in [of detention]? This is how you're gonna get me?
1057  O'Keefe: Let me lay the plans for you Mr. Posyton. What we're gonna do is remove [Auditor]
1058          liability from the police department [by accusing you of sickness and danger].
1059  Auditor: You're so mean.
1060  O'Keefe: It's not about being mean. It's about – uh – your [sickness,] your instability. ... Every
1061          night in the police station you attempt to engage to try to further (intelligible).
1062  Auditor: People do it all the time. Actually, nah, I've been one of the first to film (intelligible).
1063  **O'Keefe: Well, you're actually not because we've had a thousand before you.**
1064  **Auditor: I don't see them on YouTube. I've looked for them.**
1065  **O'Keefe: You should – they're called First Amendment audits – and they're done all the**
1066          **time.**
1067  **Auditor: This [audit] is a first.**
1068  **O'Keefe: Um – not really.**
1069  **Auditor: Not really?**
1070  **O'Keefe: No – not at all.**
1071  **Auditor: Ok, so it's normal activity.**
1072  **O'Keefe: It's – no.**
1073  **Auditor: You just said it.**
1074  O'Keefe appears to become nervous, half-heartedly chuckles, and starts to slowly and slightly
1075          pace away from and then back towards Auditor as he says: I didn't say it was nor-
1076          mal. I just said you were last. I said a day late, dollar short. That's exactly what I
1077          said – – – Well – I'm not here to tell you any semantics or mind games or otherwise.

1078  Id., at 11:18-13:33.

1079    121.  Around 2:19:22 a.m., Martinez radioed that the Raceway was "secure." A few seconds



1080   later, Padovano called an agent and began seeking a "rig" to travel to the Exxon for which Po-

1081   lice could use to propel Auditor into their camping system. Exhibit Y at 20:15-23.

1082      122.  Around 2:21 a.m., Martinez returned to the Exxon and approached the other parties.

1083      123.  Around 2:22 a.m., O'Keefe asked Police, "Can we refrain from any further conversation

1084   [with Auditor]?" Auditor said thereafter, "There is no need to notify my Mother – that is just ...

1085   malicious." O'Keefe responded that Defendants were "actually required" to harass his family.

1086   Auditor asked, "That's required? That's law?" O'Keefe said, "No." Auditor subsequently ob-

1087   served that he "h[ad] no choice" on any aspect concerning this matter; he informed Police that

1088   they were forcing him to act "involuntarily;" and he said, "You're seizing me. I've been

1089   seized." O'Keefe responded, "Oh, undisputed."

1090      124.  Forcenito moved towards Auditor's iPhone, grabbed and picked it up off of the ground,

1091   and pressed its button; this prompted the iPhone to display previously hidden images. As Force-

1092   nito moved towards and held Auditor's iPhone near O'Keefe, Auditor said, "Ya, you know Ri-

1093   ley? V California?" O'Keefe then suggested for Forcenito to power-down Auditor's iPhone.

1094   Forcenito pressed the iPhone's button again and also held it down to prompt the display of its

1095   power-down option (or other previously hidden images). Forcenito swiped the iPhone's screen

1096   or power-down option and deactivated the iPhone and placed it back on the ground near Audi-

1097   tor. Afterward, O'Keefe apprised Auditor that Forcenito had just powered down his iPhone Au-

1098   ditor said, "Ok."

1099      125.  Auditor advised Police, "You could just let me go. You could do it because I'll just walk

1100   back Home. ... I've never hurt anyone in my life. Well, I'm mean, I guess maybe emotionally.

1101   I've probably hurt someone emotionally. ... Do I actually need [prolonged detention]?"

1102      126.  Around here, Forcenito began claiming that he said "'stop' a few times" during pursuit.

1103     Auditor said that he never heard anybody say anything as he ran. Auditor also said, "If someone

1104     said 'stop,' I was stopping. I stopped. [Forcenito] said 'stop,' and I stopped." Forcenito nonethe-

1105     less acknowledged that Auditor would not have been able to hear these extra "few" newly dis-

1106     covered 'stops' or any other words while Auditor was "running fast."

1107     127.  Around 2:26 a.m., Freeman arrived at the Exxon and began standing near Auditor and

1108     the other agents. Soon after Freeman approached Auditor, Auditor asked, "Is that a smile?" Au-

1109     ditor said, "You might be a little happy. I think I see a smile." Freeman then looked behind him-

1110     self and away from Auditor for a short time to conceal his laughter from Auditor. Exhibit Z at

1111     21:47-54.

1112     128.  Gill recounted his observations and interpretations of this matter and began laughing

1113     while telling O'Keefe, Freeman, and also Forcenito that he saw nothing more than "**some dude**

1114     **running across the way**" who "ke[pt] running." See Exhibit Za at 38:46-50.

1115     129.  Police made clear and would have pursued and physically intruded upon Auditor if Auditor had

1116     attempted to leave the presence of any Police at any time herein.

1117     130.  Around 2:42 a.m., the "rig" arrived at the Exxon and parked on Central.

1118     131.  Auditor stood up off the ground, Forcenito took hold of Auditor's arm, and Forcenito, Gill,

1119     Freeman, O'Keefe, and Martinez all escorted Auditor towards Central. These Police then all

1120     walked alongside Auditor up to the "rig" and forced him inside. Forcenito also entered the "rig"

1121     to restrain Auditor inside during transport, and Gill returned to his squad car with intent on fol-

1122     lowing the "rig" from behind, all in an effort to confine Auditor for detention.

1123     132.  Around this time, Padovano utilized and dialed the permanently restricted and/or always

1124     blocked cell-phone number connecting to Auditor's Mother and aroused her out of bed. Pado-

1125     vano apprised Auditor's Mother that Police were going to throw her son at a camp. Pado- vano

1126     then put on his police neurology gloves and apprised Auditor's Mother that Auditor needed "a

1127  brain scan" because he apparently has "some kind of tumor" growing in his head of which is ev-

1128  idently disliked by Police. Auditor's Mother said, "Please, just don't hurt him."

1129    133.  Around 2:45 a.m., a WPF agent called an agent associated with detention centers. This

1130  agent summarized his interpretation of these events and said that Auditor was "walking

1131  around;" he is "not intoxicated or anything;" he "ran away from the officers;" and "the offic-

1132  ers ... talk[ed] to him." On this information, Police were informed that they could take Au- ditor

1133  to the Center for detention if they so wished.

1134    134.  Around 2:48 a.m., about once WPF's "property checks came back clear" and Defend-

1135  ants found that Westfield was crime-free, the State involuntarily Auditor transported nearly 10

1136  miles over roughly four (4) townships to the Center without consent. Forcenito carried Audi-

1137  tor's iPhone and his mask during transport.

1138    135.  Around 3:10 a.m., the parties arrived at the Center.

1139    136.  Forcenito and Gill escorted and/or forced Auditor into the Center without consent to en-

1140  sure his captivity. Forcenito and Gill remained inside of the Center and stood close by Auditor

1141  to secure his captivity and prevent Auditor from exiting.

1142    137.  An agent of the Center ordered Auditor to surrender his property into a plastic bag; For-

1143  cenito returned Auditor's iPhone and mask to Auditor. The same State agent ordered Auditor to

1144  remove all his clothes besides for his underwear and to put on Center identification cloth. Audi-

1145  tor requested to be permitted to remain wearing clothes; this agent more than implied that other

1146  agents would rip the clothes off Auditor's back and essentially glue or staple this cloth to his

1147  person if he did not put it on himself. Auditor asked Gill and Forcenito if they would just stand

1148  by and watch as their agents viciously assaulted and battered him with their cloth and restraints;

1149  Forcenito advised Auditor that Police would not intervene or do anything. Auditor thereafter



1150   nearly stripped naked in front of Gill and Forcenito as they watched; Auditor subsequently sat

1151   practically naked on a cold hard chair in the middle of a room amid chilling temperatures as he

1152   waited for the identification cloth of which took about 10 minutes to arrive.

1153      138.  Around 3:20 a.m., Forcenito and Gill exited the Center and headed back to Westfield

1154   but, before they left, Forcenito become very excited as he repeatedly said that he would have

1155   undoubtedly unleashed a police attack dog on Auditor if he and Gill had been holding a canine

1156   in their squad car at the time of their pursuit. And, right before the Police drove away and re-

1157   turned to their daily activities and continued on with their lives, Forcenito informed Auditor that

1158   he could have been "shot" or, otherwise inferred that Auditor was lucky he had not been killed n

1159   the streets by Police for having been *seen **running around***! *See, infra.*

1160      139.  Tbe Police report (the "Report") correctly observes that Auditor complied with every

1161   Police command and submitted to the State "without incident." Exhibit Zb. The Report codifies

1162   Auditor as a 'criminal suspect' during all times he was before the State in connection with this

1163   matter (which continues below). Other than that, however, besides for the Report arguably ad-

1164   mitting that Police had no basis to believe Auditor to be "a harm to himself or others," the Re-

1165   port is slightly or patently false, inaccurate, and/or misleading and is comprised of lies (some of

1166   which are easily identifiable). The Report indicates that Auditor stopped in response to Force-

1167   nito's "verbal commands;" Forcenito and "Gill were able to corner" Auditor; Forcenito asked

1168   Auditor "why he was running from the gas station with a ski mask on his face;" Auditor imme-

1169   diately blurted out that he "wanted the police to chase him and record it;" and Forcenito "then

1170   instructed [Auditor] to sit on the curb." The State may have remembered the matter as occurring

1171   this way because of either being unaware or having forgotten that Auditor documented it and

1172   because Forcenito and Gill chose not to activate their voice-recording device until around 2:07

1173    a.m. or so. Furthermore, the Report indicates that Auditor was patted-down before any WPF

1174    agent (besides Gill) arrived at the Exxon: the Report expounds that Auditor "was patted down

1175    for weapons. Next, Ofc. Martinez, Ofc. Freeman, and Sgt. O'Keefe arrived on the scene." Alt-

1176    hough the Report depicts that "Gill read [Auditor] his miranda warnings," nowhere in the Re-

1177    port is the word 'attorney' even suggested or hinted at, let alone indicates that Auditor declared

1178    "I want an attorney" over and over again during questioning. Auditor also never said that he

1179    "did not steal anything." And, for whatever reason, Police omitted from the Report that Auditor

1180    was explicitly promised and guaranteed that anything he said neither would nor could ever be

1181    used or relied upon by government or affiliates. Despite choosing to omit that and a multitude

1182    of other material information, the State felt a need to scribble down and imply that Auditor

1183    "agreed" to go to camp. O'Keefe reviewed and approved the Report of which may have been

1184    written Forcenito in part.

1185        140.  Auditor was held in the Center from about 3:00 a.m. to 9:00 a.m. on said date.

1186        141.  Around 9:00 a.m., Auditor was involuntarily transported from the Center to 655 East

1187    Jersey St., Elizabeth, NJ 07206 (the "Camp").[8]

1188        142.   Auditor was involuntarily moved and forced into a locked and secured area within the

1189    Camp for questioning.

1190        143.  Around 4:30 p.m., a Camp official conveyed to Auditor that she would make him an in-

1191    voluntary camper if he refused to sign the voluntary paperwork.

1192        144.  Americans who sign voluntary paperwork and submit to State Camps cannot lawfully be

1193    strapped down and regularly pumped-up with slews of antipsychotic drugs by the State over

---

[8] The Camp might be a geographically designated 'camping service' within the meaning of N.J.S.A. § 30:4-27.1 et seq.; the Center was/is not a 'camping service' under the same.
Similar action was held to be unlawful in Fair Oaks Hosp. v. Pocrass 266 N.J. Super. 140, 151 628 A.2d 829 (1993).

1194    objection, retain some type of medical autonomy, and are released from the Camp in substan-

1195    tially quicker fashion than compared to those Americans who refuse to sign and yield and/or

1196    who are subsquently petitioned by others to officially be 'rubber-stamped' as involuntary camp-

1197    ers.

1198        145.  Auditor moreover apprised Police of what they already knew: Camping agents "don't

1199    counsel you in life" but instead just "check a box" accusing People of danger after a brief inter-

1200    rogation (if any).

1201        145.  Under threat of aggravated assaults and batteries and considerable physical injury and

1202    trauma and documented and social stigmatization and prolonged captivity, Auditor non-consen-

1203    sually submitted to nothing more than signing a tree and involuntarily yielded to the State.

1204        146.  Auditor was involuntarily and non-consensually held in State captivity for about five (5)

1205    days (an extraordinarily short involuntary camping period); Auditor was released from the

1206    Camp from State imprisonment on July 24, 2018.

1207        147.  On July 25, 2018, around 3:00 p.m., Auditor walked into downtown Westfield during

1208    the course of a town fair or large public gathering comprised of hundred(s) of People on the

1209    streets. Auditor stealthily put on his mask in a toy-store; traveled around the downtown area out

1210    in the open with the mask over his face for about 20 minutes; and then returned Home. The pub-

1211    lic appeared to display only one of two emotions towards Auditor as they all casually went

1212    about their business: love or indifference. It might be reasonable to assume that these sediments

1213    were the only types present because nobody contacted police; and, for example, a Victoria Se-

1214    cret employee nonchalantly approached Auditor by herself and asked Auditor if he needed any

1215    shopping assistance. WPF police agent Frank Moya moreover casually asked Auditor if he

1216    needed any whatever as Auditor quietly stood near his squad car he was sitting in the same.



### Summaries – Claims – Conclusions

1217    148.  No Police saw Auditor walking on Central. No Police saw Auditor initially accelerate to

1218    considerable speed or any movement until Auditor was already deep into the Exxon lot and en-

1219    route to South Ave. And no Police saw a mask until right before Forcenito ordered Auditor to

1220    show him his hands. The only relevant information Police held (if any) rior to arbitrarily intrud-

1221    ing Auditor's life was, the fact that they saw somebody **running around in Westfield.** State vis-

1222    ibility of Auditor, his mask and acceleration, and part of his journey across the Exxon lot was

1223    heavily obstructed due to the Raceway wall, the cover of darkness and lack of illumination, Au-

1224    ditor's tininess and dark clothing, and other objects and things (e.g., traffic signs, bushy trees,

1225    lamp-posts, etc.). And, as a result of Auditor's route and rate of speed he initially moved amid

1226    these elements (and particularly amid the Raceway wall/shield) over the corresponding angle

1227    Police slowly rolled into and across the Raceway lot, State visibility of Auditor was completely

1228    suppressed until he was already located some, and likely considerable, distance deep into the

1229    Exxon lot en-route to South Ave. Polices' sight of Auditor was moreover heavily obscured

1230    and/or obstructed for nearly the entire pursuit due to their corresponding angles and speeds

1231    amid, (a) the Exxon's fencing surrounding its gas pumps; (b) large Exxon signage, many trees

1232    and bushes, a fire hydrant, and lots of traffic signs all packed tightly about and very closely near

1233    the intersection of South and Central touching the Exxon lot; (c) merchandising signage placed

1234    near the entrance of the Exxon lot affixed to South Ave; (d) two (2) tall tree-trunks, a telephone

1235    pole, garbage can, and a blue road sign, bus-sign, and a diamond-shaped left-lane-ending sign,

1236    all of which objects stood near the very edge of South Ave attached to the Exxon; and (e) the

1237    two (2) short but bushy trees standing near the back corner of the Tiger-Mart, and those plants,

1238    bushes, or tree-like things lined along the back-side of the Tiger-Mart and which obstructs



1239  visibility of the Path and Turn. Police lost all sight of Auditor for at least 12 seconds during

1240  their pursuit (but likely more time than that). The Raceway, however, is only located a mere 350

1241  feet or so away from around where Gill likely stopped his high powered WPF squad car on

1242  South Ave after having been revving it at full speed, and, Forcenito only needed to run about 80

1243  feet from South Ave to the Turn. Police did not see Auditor until they had already slowly rolled

1244  some distance deep into the Raceway lot, and to a point where they could no longer utilize the

1245  entrance/exit affixed to Central of which is located closest to the intersection of South and Cen-

1246  tral; in other words, Police did not see Auditor at least until the entrance/exit located furthest

1247  away from South and Central became the quickest route for pursuit. Gill's first and second

1248  questions he casually directed at Auditor as he was sitting on the ground provided: "What are

1249  you doing man? Why you running around?" And, before Forcenito mentioned the word 'mask'

1250  around Gill, Gill asked Auditor a third question centered on simply wanting to know why Audi-

1251  tor was "running from" a "gas station parking lot." If Gill had seen a mask, he would not have

1252  merely radioed "individual running" to WPF command center as the subject of this matter; ra-

1253  ther, he would have radioed: individual running, in a mask. Forcenito almost became speechless

1254  after he recognized Auditor wearing a mask, but his inquiry into the matter immediately thereaf-

1255  ter nevertheless focused upon 'why Auditor had a mask over his face.' Gill radioed WPF every

1256  piece of whatever he could possibly jumble together, which broadcast principally comprised:

1257  "individual running ... on foot." Consider this: If somebody is running, aren't they moving "on

1258  foot" as a matter of law in any event? Before Forcenito mentioned "a mask" around Gill, Gill

1259  apparently had no interest in any mask, but instead just wanted to know why Auditor was run-

1260  ning "from" a "parking lot." Gill certainly did not inquire about 'mask' until Forcenito men-

1261  tioned "a mask," but Gill most definitely took it upon himself to issue Auditor quasi-Miranda

1262   warnings soon after he was made aware of "mask." Forcenito likewise exhibited his oblivious-

1263   ness to 'mask' in displaying his natural reflex of basic law enforcement safety practices by issu-

1264   ing a 'show hands order,' only after having revealed his curiosity for an issue limited in scope

1265   but providing in full: "***Why you running***?" Police aver in the Report that both "[Forcenito and

1266   Gill] observed an unknown actor begin to run from the Raceway" and, the Report clarifies that

1267   this actor was most indeed "fle[eeing]" from Police. Yet, no inquiry prompted by Police and

1268   posed to Auditor was premised on 'acceleration,' 'began to run,' or 'headlong flight,' even al-

1269   most ever after their hearing of a sprint; rather, any inquiry on 'movement' was premised on

1270   having seen Auditor already 'been running.' The first two (2) of Forcenito's three (3) substan-

1271   tive inquiries even expound: "Why you running? ... Why you running around?" Police used and

1272   referred to the word 'run' during this matter as current movement faster than a jog. This is sup-

1273   ported by the meaning of "the gas station." Forcenito and Gill were not referring to the Race-

1274   way at least when initially talking about "the gas station." Police did not mention a Raceway

1275   once at any time prior to the hearing of a Raceway, and Police moreover appeared confused

1276   upon hearing of the same. Polices' initial questioning implicating "the gas station" inquired into

1277   why Auditor was "at th[is] gas station" or "at" the Exxon. Forcenito's four (4) consecutive

1278   questions of why Auditor was "at the gas station" is somewhat informative because it suggests

1279   that Police saw Auditor after he was 'already at' the Exxon. But, Forcenito divulged this tad bit

1280   of information when he apprised O'Keefe that he and Gill "didn't check" whether the "Exxon"

1281   had been burglarized "yet." Why would the Exxon be burglarized if Police just saw Auditor

1282   sprinting from the Raceway? Why did Police have no interest in examining the Raceway if they

1283   just saw Auditor sprinting from its lot? Burglaries are serious crimes. Why did Police not imme-

1284   diately run across the street to see whether anybody was dying inside the Raceway that Auditor

1285    apparently just burglarized? Why did Police keep questioning Auditor for about five (5) minutes

1286    instead of attributing any time whatsoever to inspect the Exxon lot that they were standing on,

1287    or otherwise allocate time to examining the Tiger Mart or Dunkin Donuts located about 10 feet

1288    away from them? Well, many of these questions are easily accessible: Police severely abuse and

1289    even molest the word "from." Forcenito and Gill did not see Auditor running "from" anywhere;

1290    Forcenito never even used the word 'from' to describe Auditor's running activities. Rather, Po-

1291    lice just stood around the Exxon and continued questioning Auditor because, as Forcenito and

1292    Gill both acknowledged and admitted, Police saw nothing more than Auditor "running around."

1293    The Report avers that "[Forcenito and Gill] observed an unknown actor ... wearing a blue-cov-

1294    ered ski mask" as he "fled." Even if Police have really good night-color-vision, it seems odd

1295    that Forcenito would just go ahead and get down to brass-tax on such actor's 'running activities'

1296    before ruling out whether the masked man just seen fleeing from the gas station is holding a

1297    Glock-9 or not; it seems odd because it would never happen. Police even gave up after five (5)

1298    minutes into Auditor's seizure and just issued Auditor immunity to give them the universe be-

1299    cause the State fully knew that Auditor had not committed any crime and Police also had no re-

1300    mote idea what had just happened. Forcenito moreover quickly revised the State's story in its

1301    favor: Forcenito initially informed O'Keefe over the phone that he and Gill "s[aw] someone ...

1302    start running, down Central;" after the hearing of a Raceway, Forcenito, however, subsequently

1303    informed Martinez that he and Gill "s[aw] a guy" located within the "in[side]" of the 'Raceway'

1304    lot who "t[ook] off running" "all of a sudden." Auditor, however, was also never located

1305    "[with]in" the Raceway lot; the closest Auditor came to the vicinity of the Raceway lot was his

1306    movement on the sidewalk along Central. Forcenito moreover sounds kinda nervous and scared

1307    as he tells O'Keefe that he and Gill currently "h[ad Auditor] seated down on – at the Target



1308    Mart" after advising O'Keefe that nobody had "checked" the "Exxon" for signs of crime "yet."

1309    The sole and only activity witnessed by any Police up until a split-second before Forcenito is-

1310    sued a 'show hands order' was, that of "*some dude running across the way*." Any suggestion

1311    by Police to the contrary is just another lie or otherwise stems from Police Forgetfulness Disor-

1312    der. That State description of activity, especially being accompanied by the facts that the State

1313    starts breaking out into laughter during its articulation to three (3) other State agents where no-

1314    body else is around to hear, is possibly the absolute greatest description of the least suspicious

1315    activity in the history of man; Auditor's act of "running around" moreover occurred in West-

1316    field, NJ – one of the safest places on planet Earth. The fact that a business might have been

1317    burglarized once upon a time in Westfield is irrelevant here. First, such an allegation does not

1318    morph Westfield into a 'high crime area' similar to Detroit's 8-mile. The purported burglary of

1319    the Delta station having occurred about 24 hours prior also does not categorize Westfield as a

1320    'recent crime area' or 'crime scene' needing to immediately be locked down air-tight. There

1321    was no pattern of burglaries to businesses in Westfield around this period (or perhaps ever) that

1322    could be considered as a 'crime wave' of which additional police forces were urgently required

1323    for suppression of a crime-spree. Police certainly were not requesting or demanding many addi-

1324    tional police forces in effort of suppressing crime prior to this matter. The Delta is also located

1325    in a considerably more secluded area of Westfield than compared to South and Central. The

1326    minds of arm-robbers are difficult to comprehend, but the Exxon and Raceway are possibly

1327    some of the absolute worst crime-targets located in perhaps the most publicly exposed area

1328    within the entire town. Maybe there were some cigarettes and scratch-off lottery tickets stored

1329    in the tiny Raceway shop; maybe there was some Dunkin Donuts coffee-mix or like ingredients

1330    stored in the Tigre-Mart; and maybe there were a few dollars stuffed away amid these

Page **60**



1331   businesses somewhere, besides for the Exxon: The Exxon does not store cash in a tiny vestibule

1332   in-between gas-pumps, overnight, when nobody is working, and while its operations are shut-

1333   down for renovations. Nothing was even reported stolen during the alleged 'break in' at the

1334   Delta; the police blotter merely indicates that some unknown actor(s) opened and went through

1335   some draws. Yet, even assuming arguendo that the unknown draw opener(s) could never be

1336   owners or uncoordinated employees of the Delta, the fact that there may have been a quasi-tres-

1337   pass to a secluded property in Westfield about 24 hours prior confirms that Westfield was un-

1338   likely to be hit by another trespass until sometime long after July 18. In any event, any potential

1339   crime alleged to have previously occurred sometime amid Westfield is principally irrelevant

1340   here for two (2) reasons: (a) mere occurrence of a crime does not retain particularity to anyone.

1341   And, once again, (b) Police did not see Auditor running "from" any direction; Police merely

1342   witnessed somebody "running around." Police apparently did not even think it to be necessary

1343   to go over and examine the Raceway until about 10 minutes after hearing of a Raceway. Addi-

1344   tionally, Forcenito only commanded Auditor to "stop" once, and Auditor stopped moving in in-

1345   stantaneous fashion thereafter; Auditor in fact yielded to Polices' show before Forcenito voiced

1346   the word "stop." Forcenito's claim of having said "stop a few times" is also another Police lie.

1347   Forcenito apprised O'Keefe over the phone that Auditor stopped moving upon being com-

1348   manded to "stop." Forcenito brought up his "few" newly discovered 'stops' only after approxi-

1349   mately 25 minutes into Auditor's seizure likely for no other reason than to get these 'stops' on

1350   the record. Police articulation of the word 'stop' from far away while sitting in a squad car with

1351   its windows rolled-up is not a command. And articulating 'stop' after an intended seizee has al-

1352   ready disappeared from Police sight is also not a sufficiently explicit Police command directed

1353   at an intended seizee. Why would Police articulate 'stop' at somebody who has already

1354    disappeared for a good length of time? A 'stop' command has almost no applicability to those

1355    circumstances and no police would say it under such conditions; the principal fitting command

1356    (if any) would contain some verbiage like: 'show yourself' or 'come here now.' Forcenito

1357    moreover admitted that Auditor would not have been able to hear these extra 'stops' during pur-

1358    suit anyway. Additionally, any articulation of 'stop' by Forcenito before he entered the Turn

1359    was not part of State show of authority, or otherwise even a suggestion for Auditor to do any-

1360    thing; rather, any alleged word articulated by Forcenito before he entered the Turn was nothing

1361    other than an act of Forcenito whispering words to himself, and which any of such whisper(s)

1362    were not directed at Auditor. A 15-year-old girl sporting pony-tails and pink braces across her

1363    teeth seen sitting outside a Starbucks drinking hot-chocolate and reading Twilight is arguably

1364    more suspicious than that of "some dude running across the [Westfield] way." Compare United

1365    States v. Lowe, 791 F.3d 424 (3d Cir. 2015) (Tip and positive descriptive match of "black

1366    male" wearing "grey hoodie" with hands in "hoodie pockets" and in possession of "gun" around

1367    "4:00 a.m." located "around the corner" from "kn[own]" shooting that occurred "90 minutes"

1368    prior in "violent, high crime" Philadelphia "area known for drug crimes" was not suspicious at

1369    all, notwithstanding the guy was a convicted felon illegally in possession of a firearm at the

1370    time). The State moreover fully knew that the "dude" wasn't suspicious as a matter of law; Po-

1371    lice lied heavily on that fact by manufacturing circumstances that may have justified pursuit.

1372    Flight upon noticing police can certainly give rise to a reasonable suspicion, Illinois v. Ward-

1373    low, 528 U.S. 119 (2000) (C.J. Rehnquist), but moving is still legal, and unprovoked flight is

1374    not even per se suspicious. Id., at 126-131 (Stevens, J.); see United States v. Bonner, 363 F.3d

1375    213, 217 (3d Cir. 2004) (Requiring some "plus" factor) accord United States v. Navedo, 694

1376    F.3d 463, 472 (3d Cir. 2012). Yet, there was never any "flight" here, let alone "unprovoked

1377    flight;" all the State saw was "some dude running." Was Auditor moving too fast? Not fast

1378    enough? Incorrect direction? Just in need of a little interrogation? It all revolves around that first

1379    split-second of the State's pursuit in any event. The domestic Military committed to running

1380    Auditor down with deadly weaponry at that moment showing nothing more than "some dude:"

1381    Everything was illegal then and forever thereafter. The seizure was moreover unreasonable be-

1382    fore any Police knew it had even occurred. This matter was never going to involve any type of

1383    consensual encounter, let alone be a consensual encounter at inception. Police did not approach

1384    Auditor as a police friend so to put a few questions to him and see if he would listen; rather, Po-

1385    lice ignited their engine and began vigorously pursuing Auditor by car and eventually on foot.

1386    Auditor was seized the moment he yielded; this movement occurred before Forcenito entered

1387    the Tiger Mart Path and/or around the time Auditor began decelerating on the Path after round-

1388    ing the Turn. Otherwise, Auditor was subjected to an unreasonable seizure at least the moment

1389    or nanosecond after Forcenito commanded Auditor to "stop." The Department of Justice has

1390    recognized that Police pursuits are "the most dangerous of all ordinary police activities." In-

1391    deed, Forcenito advised Auditor that Police nearly killed him; Forcenito also apprised Auditor

1392    that he would have undoubtedly been stabbed by police dog teeth Police had been carrying a ca-

1393    nine. Police pursued Auditor because pursuit was more fun than rolling across the Raceway lot

1394    and then driving back and forth over Central until 7:00 a.m.; Forcenito and Gill found their first

1395    pursuit (at least of this magnitude) to be exhilarating. Forcenito's and Gill's voluntary produc-

1396    tion of a full-blown Police pursuit, fully set on using any means possible (including deadly

1397    force) for tracking Auditor down and stopping him cold, on no information other than having

1398    seen "some dude" "running around" – shocks the American conscience as so deliberately indif-

1399    ferent and arbitrary to offend the concept of life.

149.  The entire Report (Exhibit Zb) is a blatant lie and merely depicts a police fairy-tale. For example, Police aver in the Report that, (a) Police "observed an unknown actor begin to run from the Raceway gas station" – lie; (b) Auditor "was observed wearing a blue-colored ski mask" as he ran – lie; (c) Auditor was observed "fle[eing]" – lie; (d) Forcenito gave multiple "verbal commands for [Auditor] to stop" – lie; (e) Forcenito and Gill "corner[ed]" Auditor – lie (unless Forcenito standing almost speechless and Gill casually approaching Auditor is considered 'cornering'); (f) Auditor immediately blurted out a reason for his speech – lie; (g) Auditor said that he "did not steal anything" – lie; (h) Auditor was patted-down before Martinez or any other agent arrived – lie; (i) Auditor consented or "agreed" to camp – lie; and, among others, (j) Gill "read [Auditor] his miranda warnings" – lie (see, infra); and, the State otherwise falsified a Police Report and manufactured evidence and wrote a police fairy-tale to impact and manipulate these Court proceeding in direct response to Auditor's speech, right to petition, and access of Court, all in violation of Auditor's rights secured by First and Fourteenth Amendments to the U.S. Constitution.

150.  Police 'seized' Auditor's 'person' within the meaning of the Amendment.

151.  Police seized Auditor for a law enforcement and/or investigatory purpose seeking to detect and acquire evidence linking him to crime. Police interrogated Auditor; they administered quasi-Miranda warnings to Auditor; they briefly fantasized about possible burglaries of the Exxon and Raceway stations; they advised Auditor of a purportedly unsolved 'break in' of a gas station; they said Auditor that he 'could not contact anyone' and they prohibited him from doing the same; they scoured a significant area of Westfield and conducted countless property checks over a substantial period of time looking for any remote suggestion of criminality for which they could accuse Auditor; they codified Auditor as 'criminal suspect' in the Report; and,

1423    among other factors, they checked the Raceway for signs of having been victimized by crime.

1424    152.  Police had no reason to suspect Auditor of being armed or otherwise dangerous and, Po-

1425    lices' own actions, omissions, and decision-making belie any contention to the contrary. Police

1426    fully knew and/or possessed no information to contradict the existence of the following reasona-

1427    ble assumptions and signs indicating that, (a) Auditor has no criminal record in New Jersey and

1428    he has basically never committed any crime; (b) Auditor has never hurt himself or others and he

1429    had never expressed any desire to do so; (c) Auditor had peacefully engaged about 25 different

1430    police agents inside WPF headquarters on five (5) distinct days over the previous week; (d) no

1431    encounter involving Auditor and/or Police or any other police agent has ever resulted in physi-

1432    cal confrontation; (e) Auditor has never disobeyed or failed to comply with any instruction is-

1433    sued by Police  or any other police agent and, Auditor likewise swiftly complied with every Po-

1434    lice command issued in this matter; (f) O'Keefe, Freeman, Johnson, Forcenito, Martinez, Malo-

1435    ney, Riley, and the Town and its Chief of Police were currently Police being prosecuted by Au-

1436    ditor pro us in either one (1) or two (2) pending Federal lawsuits; (g) no actual or potential wit-

1437    nesses or victims of crime were around or generally even awake, no civilian had recently re-

1438    ported any nearby criminal activity, and no police had discovered any fresh or recently unre-

1439    ported nearby criminal activity; (h) no warrants were issued against Auditor; (i) Auditor was not

1440    under the influence of alcohol or any other illegal substance; (j) Auditor was dressed in a grey

1441    striped suit-jacket, yellow tie, and dress shoes; (k) Auditor was video-recording Police with an

1442    iPhone; and (l) Auditor appeared and acted in a very calm and even somewhat nonchalant and

1443    controlling manner. Now, Polices' own actions, omissions, and decision-making ensuing Audi-

1444    tor seizure and done in response to justified assumptions and information known by Police,

1445    compels the conclusion that there was no objective basis to suspect Auditor of being armed or

/S/

III

1446    otherwise dangerous: Forcenito and Gill effectuated Auditor's seizure around 2:00 a.m. after

1447    having engaged in an all-out sprint-style foot-chase in pursuit of the then unknown Auditor who

1448    Police eventually discovered had been sprinting from the Raceway with a "ski-mask" over his

1449    face as Police started rolling into its lot. Yet, despite these circumstances, Police did not bother

1450    to conduct a brief pat-down search of Auditor until 2:15 a.m. Why? Because people sprinting

1451    from non-operating gas stations in "ski-masks" around 2:00 a.m. upon noticing Police cannot be

1452    considered as doing anything other than some late- night cardio? It cannot genuinely be dis-

1453    puted that Police agents will never hesitate for a moment's notice to go ahead and conduct a

1454    brief pat-down search for their own protection and for the safety of the seizee if that agent

1455    comes across even the faintest whiff of suspicion, whether it stem from a light sneeze or the

1456    blink of an eye, but which nevertheless leads that agent to think that they could possibly be

1457    dealing with a suspect who might be armed or otherwise dangerous; circumstances and infor-

1458    mation surrounding a particular seizee of which are known by police are utterly insufficient and

1459    will almost never give rise to a suspicion reasonably suggesting that such a seizee might be

1460    armed or otherwise dangerous – if no pat-down search has occurred, at least not until discovery

1461    of fresh information immediately preceded by a search: No pat-down search –no reasonable sus-

1462    picion of danger. Indeed, Police who reasonably suspect a seizee of being dangerous do not af-

1463    ford the suspect a luxury of being allowed to point weapons at them from close range for a few

1464    minutes while they contact and seek a supervising Police agent's guidance on whether to re-

1465    move any such weapon from the suspect's possession. Forcenito only patted Auditor down after

1466    approximately 15 minutes into Auditor's seizure because he was instructed to do so by a supe-

1467    rior agent who notably had been on the scene for about four (4) minutes. Prior to O'Keefe's ar-

1468    rival at the Exxon, O'Keefe's knowledge of information surrounding this matter was limited to

1469     nothing more than Forcenito's communications he relayed by phone. After learning of infor-

1470     mation depicting Auditor as having been seen fleeing from a gas station in a "ski-mask" around

1471     2:00 a.m., O'Keefe did not develop or articulate any thought or implication affiliated with

1472     searching Auditor during that call. Instead, O'Keefe retained such information for approxi-

1473     mately 10 minutes and did absolutely nothing whatsoever to further inquiry, suggestion, and/or

1474     commencement regarding a pat-down search of Auditor during that time. Padovano also re-

1475     tained the same aforementioned information as O'Keefe for the majority of those same 10

1476     minutes; Padovano, however, likewise did absolutely nothing whatsoever to further inquiry,

1477     suggestion, and/or commencement regarding a pat-down search of Auditor during that time.

1478     O'Keefe moreover was unaware of additional information that Forcenito and Gill had acquired

1479     in his absence and considerably prior to his arrival at the Exxon (i.e., knowledge of a Raceway

1480     and a sprint), but which information nevertheless failed to ever motivate either Forcenito or Gill

1481     to initiate a brief pat-down search of Auditor. O'Keefe likewise retained the same information

1482     for about three (3) minutes while he stood over Auditor without having done absolutely any-

1483     thing whatsoever to further inquiry, suggestion, and/or commencement regarding a pat-down

1484     search during that time. Martinez retained this information for about 10 minutes while he stood

1485     over Auditor, but also did absolutely nothing whatsoever to further inquiry, suggestion, and/or

1486     commencement regarding a pat-down search. In fact, Martinez left the Exxon before Auditor

1487     had even been patted-down, and Martinez never knew if Auditor had ever been patted-down.

1488     Any reasonable officer possessing the same information as Police under like circumstances, and

1489     who also caused about the same actions, omissions, and decision-making as Police (via declin-

1490     ing to immediately pat Auditor down upon his seizure), would have most certainly been of the

1491     belief that there existed no objective basis to suspect Auditor of being armed or otherwise

1492   dangerous. At least five (5) WPF agents (Forcenito, Gill, Martinez, O'Keefe, and Padovano)

1493   had different quantities of information, but each Police agent nevertheless had information for a

1494   considerable period of time generally depicting Auditor as having been ran down after seen

1495   sprinting from a non-operating gas station in a "ski-mask" around 2:00 a.m. or so. Not one (1)

1496   of these Police, however, did absolutely anything whatsoever to further the commencement of a

1497   pat-down search of Auditor on that information until 2:15 a.m.; it took all five (5) Police agents

1498   at least 10 minutes, respectively, before even inquiring into the mere concept of briefly patting

1499   Auditor down. And, if that is not even enough, right before Auditor was about patted-down,

1500   O'Keefe apprised Forcenito to forget WPF's pat-down procedures with Auditor because – he as

1501   and is not dangerous. Accordingly, under the circumstances, on the information known to any

1502   and/or all Police (at least prior to Auditor's pat-down (but in fact all times ever)), Police did not

1503   suspect, and had no reason to suspect, Auditor of any danger.

1504       153.   On or around July 18, 2018, Forcenito, acting pursuant to O'Keefe's instructions, patted

1505   Auditor's body down without reasonable suspicion or any cause suggesting Auditor has ever

1506   been dangerous; and, otherwise, unreasonably searched Auditor in violation of Auditor's rights

1507   secured by the Fourth and Fourteenth Amendments to the U.S. Constitution.

1508   154.   Police interrogated Auditor in the purest form known to jurisprudence. Forcenito and/or

1509   Gill repeatedly asked Auditor the exact same question again and again comprising why he was

1510   "running from" a non-operating "gas station" around 2:00 a.m. in a 'ski-mask.' Police expressly

1511   asked Auditor questions for which any response he articulated would be used against him in any

1512   potential criminal case; every word and act prompted by Police was reasonably likely to elicit

1513   an inculpatory and exculpatory response from Auditor of which a prosecution might tend to in-

1514   troduce into evidence at a hearing or trial, along with any possible evidence discovered resulting

1515    from Auditor's response(s). Police used and relied upon responses derived from Auditor in an

1516    adverse, improper, and unlawful manner so to subject Auditor to undesirable and horrifying and

1517    illegal conditions in any event.

1518        155.  Auditor was 'in custody' the moment Forcenito commenced Auditor's interrogation af-

1519    ter having ordered Auditor to halt. Auditor did not initiate contact with Police, but was instead

1520    ran down and commanded to stop and to subsequently get on the ground via being targeted for

1521    investigatory and ultimately accusatory purposes; Auditor did not freely or voluntarily submit to

1522    Police questioning, but was nonetheless barraged by the repetition of a single question prompted

1523    by Police again and again as they dismissed Auditor's demands for an attorney and expressions

1524    of silence; and, Auditor was held at a location around 2:00 a.m. of which could reasonably be

1525    described as analogous to somewhere on the surface of the moon due to it being totally devoid

1526    of any life or activity other than that of Police. Prior to Police contacting other Police, nobody

1527    knew of Auditor's location besides for the two (2) Police agents who stood over him while he

1528    lied on the ground. And, among other ensuing events, after Police had generally concluded Au-

1529    ditor's incommunicado interrogation, Police searched Auditor's person and property and there-

1530    after involuntarily transported Auditor nearly 10 miles over roughly four (4) townships and

1531    threw him into a detention center.

1532        156.  Police did not Mirandize Auditor. Police never advised Auditor that he could speak with

1533    a lawyer prior to questioning or that he could have a lawyer present during interrogation; rather,

1534    Gill just said that Auditor "ha[d] the right to an attorney." Police never advised the indigent Au-

1535    ditor that a lawyer would absolutely be supplied to assist him if he had no money to hire a law-

1536    yer and/or that such a lawyer would be supplied to Auditor prior to questioning if he so desired;

1537    rather, Gill just said that there was a possibility that "one could be appointed to" Auditor if he

1538  could not afford "one." Police never clarified the meaning of "one" and Gill's language likewise

1539  suggested the existence of restrictions on Auditor's access to "one." Police never advised Audi-

1540  tor that anything he said could or would be 'used,' applied, or deployed against him; rather, Gill

1541  just said that anything Auditor said could and would be "held," kept, contained, and/or pos-

1542  sessed against him. Additionally, Gill was not even focused on the American being held incom-

1543  municado as he articulated the foregoing sentences within eight (8) seconds. Police did not ad-

1544  vise Auditor of Miranda warnings or reasonably convey the rights set out by Miranda under an

1545  incommunicado interrogation setting.

1546  157.  Despite Polices' failure to perform the only (but absolute) prerequisite to have lawfully

1547  interrogated Auditor, Auditor nevertheless unequivocally invoked his rights of counsel and si-

1548  lence at least five (5) times. Auditor expressly requested and/or demanded to see and consult

1549  with an attorney four (4) consecutive times, saying, "I want an attorney," and Auditor de-

1550  manded to be allowed to call his attorney on his iPhone. Auditor did not, nor has he ever delib-

1551  erately, voluntarily, knowingly, intelligently, or unequivocally waived, relinquished, and/or

1552  abandoned his rights of counsel and silence in the absence of any and all expressed and implied

1553  duress, coercion, trickery, and inducements. Auditor did not initiate further communication, ex-

1554  changes, or conversations with Police after he invoked his rights of counsel and silence; Police,

1555  however, resumed, continued, and re-initiated further interrogation of Auditor again and again

1556  of each time after he invoked his rights or barred the State from lawfully interrogating him.

1557  158.  On or around July 18, 2018, O'Keefe, Forcenito, and Gill unjustifiably held Auditor in-

1558  communicado for a prolonged custodial interrogation in the absence of both Miranda warnings

1559  and presence of counsel after the right of counsel became affixed to Auditor's blood-life; and,

1560  otherwise unlawfully interrogated Auditor in violation of Auditor's rights secured by the Fifth



1561    and Fourteenth Amendments to the U.S. Constitution.

1562        159.  Police ignored each and every one of Auditor's demands for an attorney (and/or Audi-
1563    tor's pleas for Police to cease their incommunicado custodial questioning) by either refusing to
1564    even acknowledge that Auditor had said anything whatsoever or, by just continuing to interro-
1565    gate Auditor for information. Gill's acknowledgment of Auditor's third consecutive demand for
1566    an attorney (i.e., saying, "Ok"), followed by Forcenito's and Gill's choice to simply re-initiate
1567    their interrogation efforts after about 15 seconds of silence, was a particularly intimidating and
1568    egregious dismissal of natural American rights. But, after Police informed Auditor that he could
1569    not contact his attorney and their decision to re-initiated and resumed their questioning of Audi-
1570    tor (or Polices' dismissal of Auditor's fifth request for assistance of counsel), there was no basis
1571    to believe that Police were going to cease their interrogation efforts against Auditor until they
1572    elicited statements from him. And, more significantly, Police never Mirandized Auditor and,
1573    Police promised and guaranteed Auditor that anything he said neither would nor could ever be
1574    used or otherwise relied upon by government. Auditor was required to inform the State of the
1575    universe as a matter of law after he got immunity. Nothing that Auditor said during any time in
1576    connection with this matter can be used or relied upon by Police as information or evidence in
1577    this case – nothing.

1578        160.  Police arrested Auditor. Auditor was under arrest the moment the State recognized Au-
1579    ditor's identity. Otherwise, Auditor's seizure ensuing a foot-pursuit and following his yielding
1580    ripened into a de facto arrest during the progression of each respective listed act and/or some-
1581    where during, among other shows, (a) Forcenito's show hands order; (b) Forcenito's initiation
1582    and commencement of Auditor's interrogation via questioning him about activities; (c) Gill's
1583    radioing of current conditions on the ground to WPF command center; (d) Auditor's invocation

1584    of his rights of counsel and silence, and Forcenito's dismissal of those rights via continuing to

1585    question Auditor about activities; (e) Auditor's second invocation of his right to counsel and

1586    Forcenito's repetitive dismissal of that right; (f) Gill's arrival at the Exxon and subsequent order

1587    for Auditor to relocate and to get on the ground and Auditor's compliance; (g) Gill's supple-

1588    mental support and perpetuation of Auditor's incommunicado custodial interrogation via ques-

1589    tioning him about activities; (h) Forcenito's request to "send a boss;" (i) Auditor's third invoca-

1590    tion of his right to counsel and the sequential dismissal of those rights by Forcenito and Gill via

1591    persisting in questioning Auditor about activities; (j) Auditor's fourth invocation of his right to

1592    counsel; (k) Gill's issuance of quasi-Miranda warnings; (l) Gill's advisement that a superior

1593    ranking Police agent had to "come out and ... take it" from hereafter; (m) Forcenito's call and

1594    phone communications with O'Keefe; (n) O'Keefe's advisement that he was going to respond

1595    to the Exxon; (o) Forcenito's and Gill's seizure of Auditor's property and/or removing of Audi-

1596    tor from his iPhone; (p) Auditor's fifth invocation of his right to counsel via seeking to call his

1597    attorney; (q) Gill's and Forcenito's refusal to allow Auditor to consult with anyone and their

1598    subsequent continuation in questioning Auditor about activities; and/or (r) State issuance of im-

1599    munity to Auditor in exchange for the universe, and everything else. See Florida v. Royer 460

1600    U.S. 491 (1983); cf. Sibron v. New York, 392 U.S. 40, 67 (1968) (Arrest occurred the moment

1601    "the policeman grabbed Peters by the collar.") Police would have caused any reasonable inno-

1602    cent person under like circumstances to believe that they were under arrest the moment, (a)

1603    when they were held incommunicado by multiple Police agents for prolonged interrogation; (b)

1604    when they started begging for assistance of counsel and recognized soon thereafter that no help

1605    was ever coming as Police dismissed plea after plea; (c) when they received quasi-Miranda

1606    warnings; or (d) upon subsequently being stripped of their property or cell-phone. Police

1607   moreover utterly failed to diligently pursue the least intrusive lawful investigatory means availa-

1608   ble to dispel State fantasies. Notwithstanding the indicative reasonable person arrest test, other

1609   factors supporting Auditor's seizure having ripened into a de facto arrest almost immediately

1610   after being seized include: (a) Police intimately knew Auditor; (b) Auditor's seizure ensued a

1611   foot-pursuit; (c) Auditor had no warrants; (d) Auditor received quasi-Miranda warnings; (e) Au-

1612   ditor was placed under custodial interrogation; (f) Auditor was not suspected of being armed or

1613   otherwise dangerous; (g) Auditor has no criminal record in New Jersey and basically never

1614   committed any crime; (h) no civilian had recently reported any nearby criminal activity and no

1615   police had recently discovered any fresh or unreported nearby criminal activity; (i) Auditor was

1616   refusing to speak to Police and Auditor likewise barred Police from lawfully interrogating him;

1617   (j) there were no nearby potential or actual victims or witnesses of possible crime; (k) Police

1618   seized Auditor's iPhone; (l) Auditor's residence and place of employment were located about

1619   three (3) blocks away from his place of seizure in a town he has lived in for decades; (m) Audi-

1620   tor was indigent and had no means to flee; (n) Police prohibited Auditor from contacting any-

1621   body (including an attorney); (o) Police refused to let Auditor document their activities by seiz-

1622   ing Auditor's iPhone, and Police refused to activate and document their own activities with a

1623   recording device of which was currently attached to one of their persons; and, most significantly

1624   (p) Police did not immediately go over to the Raceway, CVS, or Bagel Chateau, or venture

1625   about or around any other small or nearby business (including the Exxon), or diligently launch

1626   any other lawful investigatory effort within the area's close proximity, or even tried to discover

1627   any additional fact after Auditor had been seized and interrogation had failed. As Justice Ste-

1628   vens has observed: If unknown actors exercise their "right to remain silent after being

1629   stopped, ... the stop [is un]likely to lead to probable cause to make an arrest" for "'an[y] type of

1630   crime.'" Wardow, 528 U.S., at 129 & n.2 (J. Stevens, concurring & dissenting) (citation omit-

1631   ted). Polices' voluntary pursuit and seizure safely brought in for a landing by Auditor, followed

1632   by Auditor's subsequent acts of casually turning around, slowly approaching Forcenito while

1633   removing his Giants mask, and easygoing inquiry into whether "[he was] being detained" (as if

1634   nothing had even happened), was prima facie evidence of nothing because – Police merely saw

1635   Auditor running around in Westfield! Again, although really of no relevance here: Flight and

1636   disruptive police chases can certainly "constitute reasonable suspicion," Id., at 123, n.1 (C.J.

1637   Rehnquist), but <u>moving</u> is still legal, and unprovoked flight is not even per se suspicious. Id., at

1638   126-131 (Stevens, J.); see also Bonner, 363 F.3d at 217 accord Navedo, 694 F.3d at 472. An

1639   American's lawful response to police pursuit and subsequent exercise of their "right to ... stay

1640   put and remain silent in the face of police questioning" does not serve as justification for pro-

1641   longing an intrusion for further incommunicado interrogation. Id., at 125 (C.J. Rehnquist). Stay-

1642   ing "put and remain[ing] silent" is, "by its very nature, ... quite consistent with" everyone's

1643   "right to go about" their "business," and enjoyment of this right (or "'refusal to cooperate'")

1644   "'without more, does not furnish the minimal level of objective justification needed for a deten-

1645   tion or seizure.'" Ibid (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)). Auditor moreover

1646   was cooperating: Auditor was asking for an attorney. Additionally, Auditor's mask became fac-

1647   tually meaningless after Police recognized Auditor's identity. Indeed, Forcenito did not inform

1648   O'Keefe over the phone that he suspected any type of criminal activity in being afoot (because

1649   there was none); Forcenito did not articulate any basis of knowing what Auditor was doing (pri-

1650   marily because Forcenito and Gill had seen nothing other than Auditor running around town);

1651   Forcenito did not request a canine, warrant, or any like investigatory assistance; and Forcenito

1652   did not seek any investigative guidance, and O'Keefe did not provide or offer any guidance in

1653  relation to what type of investigatory avenue (if any) had to at least be pursued while Auditor

1654  was under seizure. Rather, Forcenito basically contacted WPF for no other reason than to report

1655  that Auditor had been found. Police held Auditor for more along a defined line of what could be

1656  categorized as curiosity or reporting purposes instead of true investigatory purposes of which

1657  were nevertheless implicated. Police could not lawfully obtain information from Auditor's body

1658  or mind. Police had no use for Auditor's actual person (e.g., witness identification). And Police

1659  had no means to quickly or ever establish a probability of anything, other than perhaps with the

1660  means of driving around an entire city in search of unreported specks of crime, and even that

1661  type of investigatory avenue will almost never establish probability. O'Keefe 'saying' that he

1662  was going to respond to the Exxon is of no import at all; an order issued by O'Keefe prescribing

1663  to hold Auditor would also be of no import either. Auditor was not talking and barred any law-

1664  ful interrogation efforts. Forcenito and Gill could not just sit around and do nothing but hold

1665  Auditor until O'Keefe could mosey on over to the Exxon so he could look at Auditor. Police

1666  "intrusion is aggravated, not mitigated, if the officer's entire justification" is premised on some-

1667  one "mov[ing] from one place to another – as he or she has a right to do (and do rapidly)." Id.,

1668  at 127, n.1 (Stevens, J.) (bold emphasis added). It has also further and consistently been recog-

1669  nized that unless a detainee wishes to 'answer' questions during a stop, "he must ... be re-

1670  leased." Berkemer v. McCarty, 468 U.S. 420, 439-440 (1984). At a bare minimum, Forcenito

1671  and Gill were required to immediately pursue some investigative avenue other than interroga-

1672  tion the moment interrogation failed so to have even possibly served as a potential basis as to

1673  justify prolonging Auditor's seizure; Forcenito's and Gill's failure to do so, and Polices' subse-

1674  quent refusal to release Auditor and ensuing application of further interrogation efforts against

1675  Auditor was arbitrary and unduly intrusive and likewise unnecessarily extended the length of



1676    Auditor's seizure of which was already unreasonable nevertheless.

Cf. *In re Barnard*, 455 F.2d 1370, 1373 (D.C. Cir. 1971), *Ahern v. O'Donnell*, 109 F.3d 809, 817 (1st Cir. 1997), *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993), *Gooden v. Howard-County*, Md, 954 F.2d 960, 968 (4th Cir. 1992) (en banc), *Bailey v. Kennedy*, 349 F.3d 731, 741 (4th Cir. 2003), *Cantrell v. City of Murphy*, 666 F.3d 911, 923, n.8 (5th Cir. 2012), *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997), *McKinney v. George*, 726 F.2d 1183, 1187 (7th Cir. 1984), *Harris v. Pirch*, 677 F.2d 681, 686 (8th Cir. 1982), *Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991), *Pino v. Higgs*, 75 F.3d 1461, 1467-1468 (10th Cir. 1996), *Roberts v. Spiel-man*, 643 F.3d 899, 905 (11th Cir. 2011) *with Doby v. De-crescenzo*, 171 F.3d 858, 871-872 (3d Cir. 1999) (Relying on *McCabe v. Life-Line Ambulance Service*, 77 F.3d 540, 553 (1st Cir. 1996) to conclude that seizure supported by warrant issued by independent county administrator pursuant to Pennsylvania Mental Health Procedures Act was a 'special need' for which probable cause was not required)

1677    161.   Millions of Americans run around in masks in America every year and on October 31.

1678    October 31st is not the only day one can wear a mask.

1679    162.   The State holding Auditor under seizure so as to conduct a lengthy and large-scale crimi-

1680    nal investigation refutes any notion of the existence of an emergency present implicating the

1681    health and well-being of Auditor. Polices' will of allowing Auditor to remain un-handcuffed dur-

1682    ing this matter (including over the course of an approximately 50-minute-long criminal investi-

1683    gation) also infers that there was no emergency present suggesting Auditor to be a danger to Po-

1684    lice, himself, or others. There was no cause showing that Auditor was reasonably or probably at

1685    the time and/or ever going to be unable to control himself or Police. Although Police were surely

1686    in a position of power and intimidation, Auditor nonetheless elicited a confession and obeyed

1687    every single order Police directed at Auditor. No extraordinary developments not prompted by



1688    Police had transpired about Polices' fruitless investigatory seizure of which could have even jus-

1689    tified the mere instigation of an allegedly ensuing seizure associated with aspects of the Law.

1690    Auditor does not become dangerous because police might choose to unlawfully brutalize or oth-

1691    erwise harm Auditor for being free or for exercising his freedoms. In fact, if Auditor had not

1692    been exercising his freedom to film during this matter, Police would have unlawfully harmed and

1693    injured Auditor even further by, for example choosing to commit perjury concerning the events

1694    occurring immediately ensuing Auditor's seizure. Police would have certainly relied on the falsi-

1695    fied Police Report and testified that Auditor fled from Police and never asked for an attorney but

1696    instead just blurted out anything and everything Police wanted him to say. Gill moreover would

1697    have altered the language he used in his attempted Mirandizing under penalty of perjury; Gill

1698    would have undoubtedly fluffed-up one of the worst attempted Mirandizings in the history of ju-

1699    risprudence into a passable Mirandizing. Additionally, Auditor would have never been able to

1700    discover Polices' illegalities and cover-up if he had not been exercising his freedom to film.

1701    Since information known by Police failed to prompt a suspicion to reasonably suggest Auditor of

1702    being slightly dangerous, there was insufficient factual matter to establish a substantial chance of

1703    Auditor probably being uncontrollably dangerous of considerable magnitude. Auditor did not be-

1704    come dangerous because accusing Auditor of danger was convenient for Police. Police only ac-

1705    cused Auditor of danger because no Police could link him to any crime, and because Police knew

1706    that Auditor can apparently see through the very eyes of Police.

1707    163.   Police refuse to provide Auditor any assistance when requested and, even when Auditor

1708    is stealthily able to obtain WPF assistance, Police retaliate right back at him for obtaining that

1709    assistance. (e.g., Riley). Police apprise Auditor that he is a loser with no reputation; Police con-

1710    tinuously lie straight to Auditor's face and document many more lies implicating Auditor; Police

1711    viciously pound on solid glass windows in response to Auditor's mere presence; and, among

1712    many other factors, Police were currently Police in two (2) pending Federal lawsuits being prose-

1713    cuted by Auditor. Police had no legal standing or jurisdiction and were in no U.S. Constitutional

1714    capacity to make or be involved with making any remote decision implicating Auditor as of this

1715    point, let alone enjoy any lawful capacity to accuse Auditor of being a danger to himself.

1716    164.   O'Keefe, on behalf of himself and all Police, provided a confession and admitted to the

1717    fact that Police knew that Auditor was engaged in normal and lawful "First Amendment" activity

1718    performed by "a thousand before [him]."

1719    165.   Police utilized and relied upon information expounding their voluntary doings and the un-

1720    constitutional circumstances they freely and voluntarily subjected Auditor of which information

1721    Police elicited from Auditor by issuing him immunity, among other compulsive means, to serve

1722    as the basis for their prolonged encampment of Auditor.

1723    166.   On or around July 18, 2018, O'Keefe, Forcenito, and Gill unjustifiably held Auditor in-

1724    communicado for a prolonged custodial interrogation lavished with promises and guarantees in

1725    suppression of Auditor's access to counsel, and impermissibly elicited, induced, and coerced in-

1726    voluntary statements from Auditor and compelled Auditor to express, all in violation of Audi-

1727    tor's rights secured by the First and Fourteenth Amendments to the U.S. Constitution.

1728    167.   On or around July 18, 2018, O'Keefe, Forcenito, and Gill infringed Auditor's privacy and

1729    trespassed against and upon Auditor's person in pursuit of information, and involuntarily and un-

1730    justifiably elicited and extracted and held information acquired from Auditor's mind upon com-

1731    pelling Auditor to voice; and, otherwise, unreasonably 'searched' Auditor's 'person' and

1732    unreasonably 'seized' Auditor's hidden, protected, and privately stored information in violation

1733    of Auditor's rights secured by the Fourth and Fourteenth Amendments to the U.S. Constitution.

1734    168.    During July of 2018, O'Keefe, Forcenito, Martinez, Gill, Freeman, Padovano, and the

1735    Doe(s) non-consensually seized Auditor for law enforcement and investigatory purposes without

1736    reasonable suspicion or probable cause and, Police thereafter involuntarily propelled and forced

1737    Auditor into multiple detention facilities for days without justification or a hearing; and, other-

1738    wise, unreasonably seized Auditor in violation of Auditor's rights secured by the Fourth and

1739    Fourteenth Amendments to the U.S. Constitution.

1740    169.    During July of 2018, O'Keefe, Forcenito, Martinez, Gill, Freeman, Padovano, and the

1741    Doe(s) and Town caused about acts and omissions of which directly and/or indirectly resulted in

1742    the intended and conscious confinement of Auditor in the absence of lawful justification; and,

1743    otherwise, falsely imprisoned Auditor and deprived Auditor of liberty without process of law in

1744    violation of Auditor's rights secured by the Fourteenth Amendment to the U.S. Constitution.

1745    170.    Forcenito 'searched' Auditor's property, iPhone, and/or 'effect' within the meaning of

1746    the Amendment. Forcenito violated Auditor's legitimate subjective expectation of privacy that

1747    society recognizes as objectively reasonable while trespassing upon a constitutionally protected

1748    area to gather information. Forcenito opened, operated, and/or manipulated Auditor's iPhone

1749    without consent via intentionally pressing its button to prompt responsive activity in attempt to

1750    find, locate, and/or reveal the power-down option or hidden image within Auditor's iPhone. See,

1751    e.g., United States v. Bell, No.: 15-10029, 2016 U.S. Dist. LEXIS 52651, 2016 WL 1588098

1752    (C.D. Ill. Apr. 20, 2016) (Opening flip phone constitutes search); cf. United States v. Musgrove,

1753    845 F. Supp. 2d 932, 949 (E.D. Wis. 2011) (Manipulating computer from screen saver mode in

Page **79**

1754  prompting display of previously hidden image constitutes search) and United States v. Donald A.

1755  Hill., 795 F. Supp. 2d 1304, 1308 (M.D. Fla. 2011) (same).

1756    171.  On or around July 18, 2018, Forcenito, individually, and also thereafter acting pursuant

1757  to O'Keefe's suggestions and/or instructions, operated Auditor's iPhone without a warrant, con-

1758  sent, exigency, probable cause, reasonable suspicion, or legal justification; and, otherwise, un-

1759  lawfully entered and/or occupied and unreasonably searched Auditor's effect or iPhone in viola-

1760  tion of Auditor's rights secured by the Fourth and Fourteenth Amendments to the U.S. Constitu-

1761  tion.

1762    172.  Auditor wore his mask for the purpose of auditing police and protesting, challenging,

1763  and/or expressing disapproval for every single governmental act of which has ever limited or

1764  attempted to suppress freedom, liberty, and acts, including its act of proposing the Bill. Audi-

1765  tor's expression was a symbolic act of which could potentially be the purest form of speech rec-

1766  ognized and protected by the Amendment; Auditor appeared before the State and opposed it in

1767  the absence of any and all People. Auditor was not yelling or even speaking any words and was

1768  not causing any annoyance or disturbance to any people (primarily because no people were

1769  around or even awake). Auditor's act of breaking into a run during his expression rather than

1770  having simply chosen to express at walking pace is of no concern here; no one was around or

1771  generally even awake. Does the Amendment protect only those protests of which the protestors

1772  move no faster than 2.37 mph? Merely because the State disliked Auditor's audit and expres-

1773  sion and found it not to be of any benefit or use to it, holds no import on anything. The meaning

1774  of Auditor's speech is evident to whoever views it: The message is whatever you want it to be.

1775    173.  On or around July 18, 2018, O'Keefe, Forcenito, Martinez, Gill, Freeman, Padovano,

1776  and the Doe(s) and the Town unreasonably searched and seized Auditor's person and property,

1777  unlawfully interrogated, and falsely imprisoned and unjustifiably encamped and propelled Au-

1778  ditor into confinement in direct response to Auditor's exercise of his right to audit, protest, chal-

1779  lenge, and express disapproval for government suppression of freedom, liberty, and/or acts, of

1780  which retaliatory striking was intended to frighten, deter, and punish Auditor for having exer-

1781  cised the same and which striking would moreover chill and silence a similarly situated individ-

1782  ual of average or mere ordinary firmness from exercising the same as a result of confinement;

1783  and, otherwise abridged Auditor's speech and chilled Auditor's exercise of his right to audit and

1784  protest, challenge, and/or express disapproval for government by and through the effectuation of

1785  said acts undertaken in retaliation or in direct response to Auditor's exercise of the same, all in

1786  violation of Auditor's rights secured by the First and Fourteenth Amendments to the U.S. Con-

1787  stitution.

## Facts

1788   174.  On or around July 29, 2018, 3:30 a.m., Auditor was located about the lobby of WPF

1789  headquarters. Kapka was inside the command center room. Kapka phoned other agents to alert

1790  such agents of Auditor's presence. Kapka and Auditor spoke and Kapka instructed Auditor to

1791  "get a life" in a nasty tone of voice. Auditor thereafter exited the lobby and remained outside

1792  near WPF headquarters. No civilian or anybody was located about the public or anywhere near

1793  this area, or generally even awake. Auditor then walked upon a WPF squad car and stood on its

1794  hood for a few seconds and subsequently began to remove himself. Auditor caused no damage

1795  to this vehicle. As Auditor was walking down off the vehicle, Kapka exited WPF headquarters.

1796  Successively, Kapka thoroughly examined the vehicle for specks while Auditor stood on the

1797  sidewalk away from the vehicle and watched. Kapka concluded his investigation. In that there

1798  were no new specks and concluded that Auditor had not caused any damage to the vehicle.



1799    Next, Kapka approached Auditor and non-consensually grabbed, felt, and held Auditor's arm

1800    and pulled Auditor a few feet. Kapka advised Auditor that he would arrest Auditor if he ever aw

1801    Auditor standing about the public or its property ever again.

### Summaries – Claims – Conclusions

1802    175.  On or around July 29, 2018, Kapka unreasonably searched and seized Auditor's person

1803    in violation of Auditor's rights secured by the Fourth and Fourteenth Amendments to the U.S.

1804    Constitution.

### Facts

1805    176.  On or around August 16, 2018, 9:45 p.m., Auditor was intoxicated and walking around

1806    downtown Westfield. Auditor does not believe that he was bothering or really even speaking to

1807    anyone, but Auditor was certainly not set on engaging the State.

1808    177.  WPF purportedly received a 9-1-1 call from a concerned citizen who reported that they

1809    observed somebody who perhaps somewhat resembled Auditor's physical appearance, "walking

1810    in the downtown area trying to sell college applications" and "appear[ed] to be intoxicated." Ex-

1811    hibit Ze. Auditor was definitely walking around town and was intoxicated, but Auditor was cer-

1812    tainly not holding any papers or "sell[ing] college applications."

1813    178.  Martinez and Natale and WPF agents John Swiderski responded and approached Audi-

1814    tor. Auditor was slurring his words and informed the agents that he was intoxicated and merely

1815    walking around downtown Westfield. The agents left Auditor alone soon thereafter.

1816    179.  Exhibit Ze notes that Auditor "d[id] not appear to be intoxicated;" this is a lie.

1817    180.  On or around Sunday, June 16, 2019, 12:00 p.m., Auditor peacefully entered Holy Trin-

1818    ity Catholic Church (located in Westfield) to attend mass. Auditor silently and casually ap-

1819    proached the Tabernacle and somewhat near the alter, somewhere away from the Priest (Father

1820    Anthony) was delivering his speech. Around this time, an usher approached Auditor and asked

1821    him to sit in a pew to watch the remainder of the mass. Auditor obliged and accompanied the

1822    usher to a pew located about seven rows from the altar and sat down in the same. Around here,

1823    an unknown individual called WPF and complained of Auditor's movements. Soon thereafter,

1824    during mass and as Auditor was sitting in the aforementioned pew, three WPF police agents

1825    (Does) entered the Church and approached Auditor. These agents began questioning Auditor

1826    about the purpose of his reported movements, but Auditor did not respond; instead, Auditor ei-

1827    ther listened to Father Anthony deliver mass or sang Church hums in the face of State question-

1828    ing. After the State received no response from Auditor over a few minute span, the State ad-

1829    vised Auditor that he could either walk out of the Church or, otherwise, the agents would forci-

1830    bly remove him from the pew and the Church. In response, Auditor stood up and exited the

1831    Church during mass. Once outside, these agents continued questioning Auditor about his alleged

1832    movements but, Auditor continued to remain silent in the face of Police questioning.[9] As a re-

1833    sult, following approximately ten (10) minutes of questioning without having received any re-

1834    sponse, the State summoned a vehicle to transport Auditor to a camp and, a transport vehicle ar-

1835    rived at the Church in predictable fashion; State personnel exited the vehicle with a movable

1836    gurney and approached Auditor and the other Police agents; a WPF agent lightly pushed Audi-

1837    tor onto the gurney; the State personnel strapped Auditor onto the gurney and moved him into

1838    the vehicle; a Police agent entered the vehicle; and then these agents transported Auditor to the

1839    Center by way of State convoy.

1840      181.  Upon reaching the Center, Auditor was removed from the State vehicle, wheeled into

---

[9] Additionally, ensuing the conclusion of Church services, while all the congregates where exiting Holy Trinity Church, Father Anthony approached Auditor, remained nearby during Po- lice questioning, and continued to advise the State that Auditor is a great guy and that he also sings in the Church Choir.



1841   the Center, instructed to virtually strip naked and forced to dress in Center identification cloth.

1842   182.  Auditor was interrogated and then, sometime around 8:00 p.m., Auditor was involuntar-

1843   ily transported from the Center to the Camp and afterward wheeled into a locked area within the

1844   Camp for questioning. And, after some brief questioning, Auditor was informed that he was go-

1845   ing to be held at the Camp for further detention and control or adjustments.

1846   183.  On June 19, 2019, Auditor was released from State custody.

### Summaries – Claims – Conclusions

1847   184.  Amid June of 2019, the WPF agent John Does seized and arrested[10] Auditor's person

1848   without exigency, probable cause, reasonable suspicion, or legal justification; and, otherwise,

1849   unreasonably seized Auditor's person in violation of Auditor's rights secured by the Fourth and

1850   Fourteenth Amendments to the U.S. Constitution.

### Facts

1851   185.  Sometime around April of 2021, Auditor submitted a complaint to WPF's internal af-

1852   fairs unit: Mr. Carter accepted the Complaint via e-mail. The Complaint is an identical copy of

1853   the complaint (or D.E. 1) in Posyton v. Westfield, No. 19-cv-19013.

1854   186.  Sometime around July 2021, Mr. Carter advised Auditor that the listed Police agent in

1855   that complaint acted in a correct fashion across all spectrums and did "***nothing***" wrong.

1856   188.  On or around March 21, 2023, Auditor entered Westfield YMCA. While inside, Auditor

1857   asked a juvenile, "Do you like pussy?"[11] In response, the juvenile told YMCA staff.

1858   189.  The manager or highest-ranking YMCA employee located Auditor and told him he had

1859   to leave the YMCA and that his membership was terminated for his comments.

1860   190.  Auditor told the manager that he was sorry and that he had schizophrenia. In response,

---

[10] The arrest herein occurred the moment the State required Auditor to exit the Church.
[11] Pussy is the name of a Bond character in the James Bond franchise or 1960's hit movie, *Goldfinger*.

/S/
III

1861    said YMCA manager then called the police. Natale responded and removed Auditor from the

1862    YMCA.

1863    191.  Auditor walked thereafter into downtown Westfield, but suddenly realized that he had

1864    forgot his jacket inside the YMCA. Aware he could no longer enter the YMCA, Auditor called

1865    WPF for assistance. Natale responded and told Auditor that he would not retrieve the jacket.

1866    192.  Thereafter, as Auditor tried to walk away, Natale grabbed Auditor, guided him to sit

1867    down on a bench, lectured Auditor, and then eventually left the scene.

1868    193.  Carter likely approves of Natale's conduct

### Summaries – Claims – Conclusions

1869    194.  Onn or around March 21st, 2023, Natale unreasonably seized Auditor in violation of the

1870    Fourth and Fourteenth Amendment's to the U.S. Constitution.

1871    195.  Town of Westfield violated Auditors rights secured by the U.S. Constitution through an

1872    unlawful policy/custom (including failure to train, hire, supervise, and discipline). The Town of

1873    Westfield is responsible via 42 U.S.C. § 1983 by way of obviously needing further knowledge

1874    on constitutional limitations and oversight of policing powers which was reasonably foreseeable

1875    to result in a direct causal link to the WPF agent's infringement upon Plaintiff's rights and free-

1876    doms as explained herein.

1877    **WHEREFORE**, I pray for this Almighty Power to grant any and all on each and every

1878    respective claim by entering judgment against each Defendant jointly and severally, as follows:

1879    (a)  For any and all that may be deemed and is just or proper.

Dated this 3rd Day of April 2023

Ronald Posyton, III
113 Sussex Street,
Westfield, NJ 07090
(908) 868-7797
Ronposytoncollege@gmail.com